

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-9-2001

# Tucker v. Fischbein

Precedential or Non-Precedential:

Docket 99-1139

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Tucker v. Fischbein" (2001). *2001 Decisions.* Paper 4.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/4

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 9, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1139

C. DELORES TUCKER;
WILLIAM TUCKER, her husband

v.

RICHARD FISCHBEIN;
BELINDA LUSCOMBE;
NEWSWEEK MAGAZINE;
JOHNNIE L. ROBERTS;
TIME INC.

C. Delores Tucker;
William Tucker,

     Appellants

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(D.C. No. 97-cv-06150)
District Judge: Honorable Ronald L. Buckwalter

Argued October 1, 1999

BEFORE: NYGAARD, ALITO, and ROSENN, Circuit Judges.

(Filed: January 9, 2001)

      Richard C. Angino, Esq. (Argued)
      Angino & Rovner
      4503 North Front Street
      Harrisburg, PA 17110
       Attorney for Appellants

Alan J. Davis, Esq.
Stephen J. Kastenberg, Esq.
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street
51st Floor
Philadelphia, PA 19103

Donald N. David, Esq. (Argued)
Beth W. Fischbein, Esq.
Fischbein, Badillo, Wagner &
 Harding
909 Third Avenue
New York, NY 10022
 Attorneys for Appellee
Richard Fischbein

Laura E. Krabill, Esq.
Wolf, Block, Schorr & Solis-Cohen
22nd Floor
Philadelphia, PA 19103

Paul G. Gardephe, Esq. (Argued)
Milton L. Williams, Jr.
Time, Inc.
Legal Department
1271 Avenue of the Americas
New York, NY 10020
 Attorneys for Appellee
Belinda Luscombe and Time, Inc.

Kevin T. Baine, Esq. (Argued)
1650 Arch Street
Williams & Connolly
725 12th Street, N.W.
Washington, DC 20005
 Attorney for Appellee
Newsweek Magazine and
Johnnie L. Roberts

OPINION OF THE COURT

ALITO, Circuit Judge:

This case marks the third round of litigation between C. Delores Tucker, a former state official and a community leader, and the record companies and performers responsible for what is known as "gangsta rap."[1] Since 1993, C. Delores Tucker has crusaded against gangsta-rap lyrics, which, she asserts, "grossly malign black women, degrade the unthinking young black artists who cr eate [gansta rap], pander pornography to our innocent young children, hold black people universally up to ridicule and contempt, and corrupt its vast audience of listeners, white and black, throughout the world." App. at 2322. Mrs. Tucker has taken her message to shareholder meetings of major corporations to pressure them to divest their holdings in record companies that pr oduce gangsta rap; she has also addressed Congress to ur ge that steps be taken to "curb and control the proliferation of vile, demeaning pornographic and misogynistic music." Id.

Mrs. Tucker's efforts caught the attention of the rap industry, and in August 1995, Interscope Recor ds, Inc., filed suit against her in the United States District Court for the Central District of California (Tucker I), alleging that she had induced a breach of contract between Death Row Records, Inc., and Interscope. Interscope and Death Row voluntarily withdrew that suit. Then, in July 1997, Mrs.

_____

1. "Gansta rap" has been described as "a form of hip hop music that became the genre's dominant style in the 1990s, a reflection and product of the often violent lifestyle of American inner cities afflicted with poverty
and the dangers of drug use and drug dealing. The r omanticization of the outlaw at the centre of much of gangsta rap appealed to rebellious suburbanites as well as to those who had firsthand experience of the the harsh realities of the ghetto. Encyclopedia Britannica, "Gangsta Rap" <http://www.britannica.com/bcom/eb/article/3/ 0,5716,128693+1,00.html>. Prominent gangsta rap groups are described as "present[ing] tales of gangs and violence," "offer[ing] hard-hitting depictions of crack-cocaine related crime," and featuring "a marriage of languid beats and murderous gang mentality." Id.

3

Tucker and her husband, William Tucker , filed a complaint in the United States District Court for the Easter n District of Pennsylvania (Tucker II), alleging that the lyrics in two songs by deceased rapper Tupac Shakur on an album called All Eyez On Me had attacked Mrs. Tucker using "sexually explicit messages, offensively coarse language and lewd and indecent words" and that she had r eceived death threats because of her activities. Named as defendants were Shakur's estate; Interscope, which had produced Shakur's album; and four other companies, including T ime-Warner, Inc., which allegedly maintained a financial inter est in Interscope. Asserting claims for intentional infliction of emotional distress, slander, and invasion of privacy, Mrs. Tucker sought damages for medical expenses and mental injury. In paragraph 50, the Complaint alleged that her "husband, William Tucker has as a r esult of his wife's injuries, suffered a loss of advice, companionship and consortium." Tucker II Compl. P 50 (emphasis added), App. at 23. Loss of consortium means loss by one spouse of "whatever of aid, assistance, comfort, and society [one spouse] would be expected to render or to bestow upon [the other]." Hopkins v. Blanco, 302 A.2d 855, 856 (Pa. Super. 1973), aff 'd, 320 A.2d 139 (Pa. 1974). Loss of consortium includes, but is not limited to, "impairment of capacity for sexual intercourse." Restatement (Second) of Torts S 693(1) (1977); see also W. Page Keeton, Prosser and Keeton on Torts 931 (5th ed. 1984).

The filing of the Tuckers' lawsuit spawned numer ous articles that focused on the "loss of consortium" claim. Among them was an article printed by the Philadelphia Daily News on August 2, 1997, in which the lawyer representing Shakur's estate, Richar d Fischbein, was quoted as saying: "[I]t is hard for me to conceive how these lyrics could destroy her sex life . . . but we can only wait for the proof to be revealed in court." App. at 30. Following the Philadelphia Daily News article, wire and news services throughout the country picked up the story, and many of them quoted or paraphrased Fischbein's comment interpreting the Tuckers' claim as seeking compensation for damage to their sex life.

On August 20, 1997, Newsweek reporter Johnnie L. Roberts telephoned the Tuckers' attorney, Richard C.

Angino, regarding an upcoming Newsweek story about the lawsuit. According to Angino, he informed Roberts that, although loss of consortium could mean loss of sex in some cases, it did not mean that in this case. See App. at 645. Roberts disputes Angino's account of this conversation.

On August 26, 1997, Roberts interviewed Fischbein in connection with the story. Roberts's notes show that Fischbein told him that one of the claims in the Tuckers' complaint involved interference with sexual relations. In addition to speaking with Fischbein and Angino, Roberts read the complaint and looked up the definition of consortium before writing his article. On September 1, 1997, Newsweek printed an article written by Roberts and entitled "Grabbing at a Dead Star." The article stated: "Even C. Delores Tucker, the gangsta rap foe, wants a chunk [of Tupac Shakur's estate]. She and her husband claim that a lyrical attack by Tupac iced their sex life." App. at 90. Although the article did not mention the conversation between Roberts and Angino, it did quote Fischbein as commenting as follows regarding the loss-of-consortium claim: "I can't wait to hear the testimony on that subject." Id.

The next day, the Tuckers filed an amended complaint in Tucker II (the "First Amended Complaint"), which included an additional claim against Fischbein for making "false and misleading statements regarding the claim herein, through published statements that C. Delores Tucker filed suit because of a `loss of her sex life.' " App. at 1711. The amended complaint was served on Fischbein and the other defendants, including Time-Warner , Inc.

On September 12, after he was served with the First Amended Complaint, Fischbein gave an interview to Time reporter Belinda Luscombe concerning the Tuckers' case. Luscombe stated in deposition that Fischbein had told her that "this was a lawsuit about emotional distr ess and one of the things affected were [sic] her sexual relationship with her husband." See App. at 2197. T ime printed Luscombe's article, entitled "Shakur Booty," on September 15, 1997. See App. at 34. Although the article did not quote Fischbein, Luscombe admitted in her deposition that she based the article solely on her interview with Fischbein and

5

on other articles, most of which appear to be derived from Fischbein's initial comments to the press in early August.

On October 1, 1997, the Tuckers filed the complaint that is the subject of this action (Tucker III). The complaint alleges that Fischbein, Time, Inc. ("T ime"), and Newsweek, Inc. ("Newsweek") defamed the Tuckers by characterizing their loss of consortium claim in Tucker II as a claim for loss of sexual relations. Specifically, the Tuckers maintain that Mrs. Tucker's reputation as a moral leader was compromised when Time and Newsweek printed Fischbein's characterization of her suit as one to recover for the lyrics' effect on her sex life.

Time, Newsweek, and Fischbein each moved for summary judgment, and the District Court granted their motions, holding that the statements in question were not capable of a defamatory meaning and, alternatively, that the Tuckers, who conceded that they were "public figur es," could not adequately prove that the defendants acted with"actual malice." Although the defendants had also contended that the Tuckers could not prove that the statements were false, the Court made no explicit holding on that question. This appeal followed.

I.

"[A]lthough a defamation suit has profound First Amendment implications, it is fundamentally a state cause of action." McDowell v. Paiewonsky, 769 F .2d 942, 945 (3d Cir. 1985). In this appeal, our first duty is to resolve a question of state law, i.e., whether the Tuckers adduced sufficient evidence to show that the statements in question were defamatory under Pennsylvania law. If the plaintiffs satisfied that burden, we must then deter mine if the First Amendment precludes recovery. See Steaks Unlimited, Inc. v. Deaner, 623 F.2d 264, 270 (3d Cir . 1980).

Under Pennsylvania law, a defamation plaintif f bears the burden to show:

> (1) The defamatory character of the communication.

> (2) Its publication by the defendant.

6

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

42 Pa. Cons. Stat. Ann. S 8343(a) (1998). Under Pennsylvania law, the court must decide at the outset whether a statement is capable of defamatory meaning. See Thomas Merton Ctr. v. Rockwell Int'l Corp. , 442 A.2d 213, 215-16 (Pa. 1981). If the court determines that the statement is capable of a defamatory meaning, the jury must then decide whether the recipient actually understood the statement to be defamatory. See Corabi v. Curtis Publ'g Co., 273 A.2d 899, 904 (Pa. 1971).

A statement is defamatory if "it tends so to har m the reputation of another as to lower him in the estimation of the community or to deter third persons fr om associating or dealing with him." Id. (citing Birl v. Philadelphia Elec. Co., 167 A.2d 472, 476 (Pa. 1960)). Accord Restatement (Second) of Torts S 559. A court must examine the meaning of the allegedly defamatory statement in context, see Beckman v. Dunn, 419 A.2d 583, 586 (Pa. Super. 1981), and must evaluate "the effect [it] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to cir culate." Corabi, 273 A.2d at 907. While it is not enough that a statement is embarrassing or annoying, see Bogash v. Elkins, 176 A.2d 677, 678 (Pa. 1962), a court should not dismiss a complaint unless it is "clear that the publication is incapable of a defamatory meaning." V itteck v. Washington Broad. Co., 389 A.2d 1197, 1200-01 (Pa. Super. 1978).

The statements at issue here were the following:

(1) The statement in Time's September 22, 1997, article, "Shakur Booty," that "[t]he prize for the most bizarre suit . . . goes to anti-rap warrior C. Delores Tucker, who claims that remarks made about her on Shakur's Album All Eyez on Me caused her so much distress that she and her husband have not been

7

able to have sex. She wants $10 million." App. at 1634.

(2) The statement in Newsweek's September 1, 1997, article, "Grabbing at a Dead Star," that "[Mrs. Tucker] and her husband claim that a lyrical attack by Tupac iced their sex life." App. at 90.

(3) Fischbein's comment, quoted in an August 2, 1997, Philadelphia Daily News article, that "[i]t's hard for me to conceive how these lyrics could destroy her sex life . . . but we can only wait for the pr oof to be revealed at trial." App. at 29.

(4) Fischbein's August 20, 1997, statement to Newsweek columnist Johnnie L. Roberts that Mrs. Tucker was bringing suit, in part, to recover for damage to her sex life, and his statement, quoted in the Newsweek article, that "I can't wait to hear her testimony on that subject." App. at 31.

(5) Fischbein's statement to Belinda Luscombe of Time that Tucker II "was brought for emotional distress and that part of that was that . . . her sexual relationship with her husband was affected." App. at 2197.

The District Court held that none of these statements could have a defamatory meaning. The Court concluded that, although the statements might be annoying or embarrassing, they could not support a cause of action for defamation. The Court stated: "There is a vast difference between being annoyed and/or embarrassed on the one hand, and being disgraced and ridiculed to the extent that one's reputation is harmed and lower ed in the estimation of the community, on the other." Dist. Ct. Op. at 6.

We cannot agree with the District Court's analysis. Statements considerably milder than or comparable to those at issue here have been held by the Pennsylvania Supreme Court to be capable of a defamatory meaning. For example, in Birl v. Philadelphia Elec. Co., 167 A.2d 472 (Pa. 1960), the Pennsylvania Supreme Court held that a statement that an employee quit without notice was capable of a defamatory meaning because recipients could

8

conclude that the employee lacked honor and integrity "and was not a person to be relied upon insofar as his business dealings were concerned." Id. at 476. In Cosgrove Studio & Camera Shop v. Pane, 182 A.2d 751 (Pa. 1962), the Pennsylvania Supreme Court held that an advertisement was capable of a defamatory meaning because it implied that a competitor had bad business practices and might lead a recipient to question the competitor's integrity. Id. at 754.

Reading the statements at issue in this case in context and looking at the impression that they wer e likely to engender in the minds of the average reader , we conclude that each is capable of a defamatory meaning. Mrs. Tucker has led a campaign against the immorality of gangsta rap and those who profit from it. The statements made by the defendants--to the effect that Mrs. Tucker and her husband brought a $10 million lawsuit because Shakur's lyrics damaged their sex life--carry numer ous disparaging implications. Because of the inherent implausibility of the idea that lyrics alone could cause millions of dollars of damage to a couple's sexual relationship, the statements were capable of making the Tuckers look insincere, excessively litigious, avaricious, and perhaps unstable. Furthermore, the statements tended to suggest that the Tuckers are hypocritical, that after condemning the gangsta rap industry for profiting from por nography, the Tuckers were only too willing to open up their own sex life for public inspection in order to reap a pecuniary gain. In the more colloquial language used by the defendants themselves, the statements suggested that the Tuckers were"[g]rabbing [a]t a [d]ead [s]tar['s]" "[b]ooty" and were willing to take the witness stand at trial and publicly provide the testimony about their sex lives that Fischbein "[couldn't] wait to hear." Such statements were capable of lowering the Tuckers' reputation in the eyes of the community and of causing others to avoid associating with them.

It is worth noting that, not only were the defendants' statements capable of a defamatory meaning, but the Tuckers adduced evidence that their reputations were in fact adversely affected. See 42 Pa. Cons. Stat. Ann. S 8343(a)(4) (requiring plaintiff to prove that the recipient

9

understood the statement as defamatory). In a Philadelphia Daily News article dated August 6, 1997, the author stated: "I also appreciate how some people felt betrayed when she filed a $10 million suit that has trivialized her and her movement. For a week now, even some of her most consistent supporters have been questioning her motives and snickering over the suit's allegation that her sex life has been ruined by a couple of Tupac Shakur raps." App. at 2143. An August 17, 1997, Chicago Sun-T imes article noted: "[I]n my eyes Tucker has suffer ed a self-inflicted blow to her credibility. . . . Seems to me the real humiliation comes when a woman who has fought har d against gangsta rap makes the very personal and embarrassing claim that a couple of those very songs ruined her love life." App. at 265-66.

In short, the District Court erred when it held that the defendants' statements were not capable of a defamatory meaning under Pennsylvania law. The statements had the tendency to lower the Tuckers in the estimation of the community and to deter third persons fr om associating with them. We must therefore examine whether the First Amendment poses a bar to the Tuckers' claim.

II.

When a public official or public figure sues for defamation, the First Amendment demands that the plaintiff prove both that the statement was false and that it was made with "actual malice." Hustler Magazine v. Falwell, 485 U.S. 46, 52 (1988) (emphasis in original omitted); New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964); Curtis Publ'g Co. v. Butts, 388 U.S. 130, 162-65 (1967) (Warren, C.J., concurring) (applying the New York Times standard to public figures); U.S. Healthcare v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 931 (3d Cir. 1990).

A. Actual malice

Under New York Times v. Sullivan  and its progeny, actual malice means "knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not." New York Times, 376 U.S. at 279-80. A public figure must

10

adduce "sufficient evidence to permit the conclusion that the defendant entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1967). "[A] court ruling on a motion for summary judgment must be guided by the New York Times `clear and convincing' evidentiary standard in deter mining whether a genuine issue of actual malice exists--that is, whether the evidence presented is such that a reasonable jury might find that actual malice has been shown with convincing clarity." Anderson v. Liberty Lobby, 477 U.S. 242, 257 (1986).

1. Fischbein

The Tuckers assert two grounds for holding that Fischbein acted with actual malice. First, the Tuckers argue that Fischbein, as a lawyer, should have known that a claim for loss of consortium may not have anything to do with damage to sexual relations. It follows, the Tuckers contend, that Fischbein was at least reckless when he told the press that Mrs. Tucker was trying to r ecover for injury to her sex life.

We reject this argument. A claim for loss of consortium may concern damage to sexual relations and, with respect to the period prior to the service of the Tuckers' First Amended Complaint, there is no evidence that Fischbein was informed that Mr. Tucker's consortium claim did not refer to damage to sexual relations. Nor is there evidence from which a jury could find that Fischbein entertained serious doubts about the truthfulness of his statements at any time before the filing of the First Amended Complaint. Consequently, the record is insufficient to show by clear and convincing evidence that Fischbein was guilty during this period of anything more than negligence in jumping to the conclusion that Mr. Tucker's loss-of-consortium claim related, at least in part, to sex. See St. Amant, 390 U.S. at 731; Time, Inc. v. Pape, 401 U.S. 279, 290 (1971) ("The deliberate choice of an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of `malice' under New York T imes."). The Tuckers point out that Fischbein, as the representative of Shakur's estate, had a motive for discrediting Mrs. Tucker, but

11

circumstantial evidence of Fischbein's motive alone cannot satisfy the actual malice standard.

The Tuckers' second argument regar ding Fischbein, however, does have merit. As previously noted, on August 27, 1997, the Tuckers filed their First Amended Complaint, which added Fischbein as a defendant and sought millions of dollars in damages. The basis for adding Fischbein was set out in Paragraph 46, which averred that Fischbein had "made false and misleading statements regar ding the claim herein, through published statements that C. Delores Tucker filed suit because of a `loss of her sex life. ' " App. at 1711–12 (emphasis added). It is undisputed that Fischbein was personally served with this complaint before his interview with Time magazine reporter Belinda Luscombe on September 12, 1997.[2] Nevertheless, according to Luscombe's deposition, Fischbein told her during this interview that the Tuckers were attempting to r ecover for damage to their sexual relationship.

Based on this sequence of events, we are convinced that a reasonable jury could find by clear and convincing evidence that, at least as of the date of the service of the First Amended Complaint, Fischbein had actual knowledge that the Tuckers were not seeking to recover for damage to their sexual relationship. Since the First Amended Complaint alleged that Fischbein had defamed the Tuckers by stating that they were attempting to r ecover for damage to their sexual relations, a reasonable jury could certainly conclude that an attorney who read the complaint would understand that the Tuckers were not going to attempt to recover for such damage. (Indeed, it would be hard to interpret the First Amended Complaint any other way.) Fischbein states that he did not read the First Amended Complaint before speaking to Luscombe, but a r easonable jury could believe that a person who is added as a defendant in a multi–million dollar lawsuit is very likely to read the complaint shortly after receiving it in order to see

_____

2. This argument does not apply to any statements made by Fischbein prior to August 27, 1997, including the comments published by the Philadelphia Daily News and the August 26 interview with Roberts of Newsweek.

12

why he or she has been sued. A reasonable jury could disbelieve Fischbein's story and find by clear and convincing evidence that Fischbein did read the First Amended Complaint before the interview. W e must therefore reverse the judgment of the District Court insofar as it dismissed the Tuckers' claim against Fischbein with regard to the statements to Luscombe.

The dissent disagrees with our conclusion on this point because, in the dissent's view, "[t]he language of the Amended Complaint, in the context of the Tuckers' pr evious statements and actions, was insufficient to indicate a change in their attitude toward alleging a loss of sexual relations." Dissent at 24. But even if we agreed with the dissent's characterization of the Tuckers' prior statements,3 the following stark facts remain: (a) the Amended Complaint added Fischbein as a defendant and was served upon him; (b) the Amended Complaint asserted that Fischbein had defamed the Tuckers by stating that"C. Delores Tucker filed suit because of a `loss of her sex life' " (App. at 1711-12); and (c) the Amended Complaint sought millions of dollars in damages. Surely a r easonable jury could find, by clear and convincing evidence, that Fischbein knew, after reading the Amended Complaint, that, whether or not the Tuckers had previously been seeking to recover for damage to their sexual relationship, they were no longer doing so.4

_____

3. The dissent seems at times to make findings of fact. For example, the dissent opines that "the statements made by the Tuckers and their attorney were deliberately cagey and equivocal so that they could, if they wished, introduce evidence of impotence and sexual disfunction at trial." Dissent at 22. This amounts to a finding of fact r egarding the intent of the Tuckers and their attorney, and it is the province of the trier of fact,
to make such a finding.

4. The dissent "find[s] it ironic that [we] believe[ ] there could be actual
malice in a statement so similar to [the following statement] attributed to Mr. Tucker in The Philadelphia T ribune" (Dissent at 27):

        Pointedly asked how the lyrics could affect his sex life, he said,
        "That's just a brief reference [in the lawsuit] –– a small part of
it. We
        have to represent the situation as accurately as we can and the
only
        way to experience it is to have it happen to you."

13

2. Roberts and Newsweek

The Tuckers' case against Roberts and Newsweek includes some evidence from which a reasonable jury could infer actual malice, but not the clear and convincing evidence needed to survive summary judgment. Accordingly, we must affirm the District Court's grant of summary judgment in favor of Roberts and Newsweek. Viewing the evidence in the light most favorable to the Tuckers, their attorney, Richard C. Angino, spoke with Roberts on August 20, 1997, six days before Roberts wrote "Grabbing at a Dead Star." According to Angino, he told Roberts in the course of this phone call that "consortium can mean, in some cases, sex. I said most of the time it doesn't and it doesn't in this case." Angino Dep., App. at 636.

Other statements in Angino's deposition severely weaken the Tuckers' position, however, and make it impossible for them to satisfy the clear and convincing standard. For instance, when asked exactly what he said to put Roberts on notice that the Tuckers' claim did not involve impairment of sexual relations, Angino replied: "I said only in the rarest of cases would you have a count that actually involves sex. I'm under oath, so I cannot say to you that I said specifically, this case does not involve sex ." App. at

_____

App. at 1631 (brackets in original).

At most, however, this statement may show Mr . Tucker's intent at the time of the article, in August 1997. It hardly establishes that the Tuckers were seeking to recover for damage to their sexual relations after they later filed the Amended Complaint.

Moreover, the dissent's interpretation of the statement attributed to Mr. Tucker in the article, while certainly reasonable, is not compelled. Without knowing the exact question posed by the reporter (and the question is merely paraphrased in the article), it is not possible to rule out the possibility that Mr. Tucker was simply referring to his claim for loss of consortium, which need not necessarily have pertained to sex. In other words, he may have said that the loss of consortium claim was "just a brief reference [in the lawsuit]-- a small part of it." If evidence of this statement is admitted at trial, it will be for the trier of fact to interpret it.

14

431 (emphasis added). Actual malice requir es a plaintiff to establish that the defendant had a subjective belief that the statement was false when made, and Angino's equivocation about the exact words he used defeats any hope the Tuckers might have of proving actual malice on the part of Roberts or Newsweek by clear and convincing evidence. Therefore, we affirm the District Court's entry of summary judgment in favor of those parties.

3. Luscombe and Time

The Tuckers set forth 24 theories under which, they assert, it could be found that Belinda Luscombe and Time acted with actual malice in connection with the"Shakur Booty" article of September 15, 1997. Many of these theories are grounded on allegations of poor journalistic practices--e.g., that Luscombe had a pr econceived story-line; that she did not follow Time's editorial guidelines; that she failed to conduct a thorough investigation; and that she copied from other stories but changed their language without a factual basis. As the District Court found, these theories of actual malice are without support in the case law. While we will discuss only a few of these theories below, we have carefully considered and r ejected all of them.

The Supreme Court has made clear that even an extreme departure from professional standar ds, without more, will not support a finding of actual malice. See Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 665 (1989). Likewise, a failure to investigate, standing alone, does not constitute actual malice. See St. Anant v. Thompson, 390 U.S. at 730-31; Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1089 (3d Cir. 1985).

The Tuckers assert that Luscombe avoided the truth by relying on biased sources while ignoring the Tuckers' news release, which explained the import of their Complaint. Although the Supreme Court has held that purposeful avoidance of the truth may support a claim of actual malice, the evidence here falls short. In Harte-Hanks, the Court held that there was sufficient evidence of actual malice where, among other things, a reporter failed to

15

interview a key witness to events being reported in a story, and the circumstances suggested that this was done for fear that the witnesses' statement might contradict the story the paper was committed to running. See 491 U.S. at 682-83. Likewise, in Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967), the Court found actual malice when the Saturday Evening Post failed to make adequate investigative efforts in the face of notification that the report they were about to print was false. Id. at 169-70. The element present in Harte-Hanks and Butts but lacking here is evidence from which a reasonable jury could infer that Luscombe doubted the veracity of her story. See Harte-Hanks, 491 U.S. at 692.

The Tuckers assert that the service of the First Amended Complaint on Time-Warner, Inc., the parent corporation of Time, Inc., which publishes Time magazine and employs Luscombe, should have put Luscombe on notice that the Tuckers did not seek recovery for injury to their sex life. This argument is far-fetched. Time-Warner, Inc., a huge media and entertainment conglomerate, was served because it was one of the original defendants due to its alleged connection with Interscope Records. There is no evidence that Luscombe or anyone else actually involved with the "Shakur Booty" article was given or r ead the First Amended Complaint, and unlike Fischbein, neither Luscombe nor anyone else employed by Time magazine was named as a defendant in that complaint. The Tuckers have simply adduced no evidence (let alone clear and convincing evidence) that Luscombe or anyone else involved with the "Shakur Booty" article was aware that the Tuckers did not intend to include injury to their sex life as a component of the loss of consortium claim.

We likewise see no merit in the Tuckers' ar gument that Luscombe and Time acted with actual malice because they copied other stories but then changed their language without a factual basis. Although the circumstances under which an article is changed may sometimes be enough to show actual malice, the present case does not fall into that category. This case is readily distinguishable from St. Surin v. Virgin Islands Daily News, Inc., 21 F.3d 1309 (3d Cir. 1994). In St. Surin, a newspaper reporter interviewed an Assistant United States Attorney who confir med that St.

16

Surin was being investigated but refused to comment on whether charges would be brought. An editor, however, "changed it to read that the government expected to file charges against St. Surin the following week." Id. at 1318. We held that the evidence, viewed in the light most favorable to St. Surin, showed that the editor was aware of facts showing that her changes to the article in question made it false. See id.

In this case, there is no comparable evidence. The "Shakur Booty" article was clearly derived in large part from previously published articles and did not change the import of those articles in any material way. Moreover , as discussed above, there is no evidence her e from which a reasonable jury could find that Luscombe was on notice that the facts related in her story wer e false. Accordingly, we affirm the District Court's grant of summary judgment in favor of Time and Luscombe.

B.

Although the District Court based its judgment only on defamatory meaning and actual malice, it stated:"Counsel for all defendants have made various other ar guments, not the least of which is that the statements wer e true. By not commenting on them, I have not necessarily r ejected them." Dist. Ct. Op. at 13. On appeal, the defendants ar gue that the decision of the District Court may be affir med on the alternative ground that the Tuckers have not adduced sufficient evidence that any of the challenged statements were false when made. Although we may affir m a decision on an alternative ground, see, e.g. , Erie Telecomms., Inc. v. City of Erie, 853 F.2d 1084, 1089 n.10 (3d Cir. 1988), we decline to do so here.

Truth is an affirmative defense under Pennsylvania law, see 42 Pa. Const. Stat. Ann. S 8343(b)(1), but the United States Supreme Court has held that a publicfigure must bear the burden of proving falsity. See Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776 (1985) (holding that "the common law's rule of falsity--that the defendant must bear the burden or proving truth--must similarly fall here to a constitutional r equirement that the

17

plaintiff bear the burden of showing falsity"); see also Steaks Unlimited, Inc. v. Deaner, 623 F.2d 264, 274 n.49 (3d Cir. 1980) (suggesting that Pennsylvania's practice of placing the burden of proving truth on the defendant is probably unconstitutional); Dunlap v. Philadelphia Newspapers, Inc., 448 A.2d 6, 13-14 (Pa. Super . 1982) (same). Thus, even though Fischbein's comments to Luscombe are capable of a defamatory meaning, and even though he may have uttered them with actual malice, Fischbein cannot be held liable unless the Tuckers can prove that the comments were false.

We conclude that the Tuckers have pointed to proof that is sufficient to show, either by a preponderance or by clear and convincing evidence,5 that Fischbein's statements to Luscombe after the filing of the First Amended Complaint were false.6 The First Amended Complaint alleged that Fischbein had defamed the Tuckers when he said that they were trying to recover for damage to their sexual relations. In light of that allegation, it seems clear--and a reasonable jury could certainly find--that the First Amended Complaint itself did not seek to recover for such damage. (Surely a reasonable jury could find that, if the Tuckers' case had gone to trial under the Amended Complaint, the Tuckers did not intend to seek to recover both on the theory that Mr. Tucker suffered a loss of consortium and that Fischbein defamed them by asserting that they intended to recover for a loss of consortium.) Fischbein, however, supposedly told Luscombe that "this was a lawsuit

_____

5. The Supreme Court has explicitly declined to decide whether the plaintiff must prove falsity by a pr eponderance of the evidence or by clear and convincing evidence. See Harte-Hanks , 491 U.S. at 661 n.2 (declining to resolve the issue, but acknowledging disagreement among the circuits). Compare Firestone v. Time, Inc., 460 F.2d 712, 722-23 (5th Cir. 1972) (Bell, C.J., concurring) (ar guing for a clear and convincing standard) with Goldwater v. Ginzburg, 414 F.2d 324, 341 (2nd Cir. 1969) (suggesting a preponderance of the evidence standard) and Rattray v. National City, 51 F.3d 793, 801 (9th Cir . 1995) (adopting Goldwater).

6. Because we have held that there is not sufficient evidence that Fischbein acted with actual malice prior to that date, we need not and do not decide whether there was enough evidence to show that the statements he made during that period were false.

18

about emotional distress and one of things af fected were [sic] her sexual relationship with her husband." App. 2197. We hold that there was sufficient evidence of falsity to go to the jury.

III.

Finally, we hold that the District Court corr ectly denied the Tuckers' motions to depose in-house counsel at Time and Newsweek. This Court exercises plenary review over a discovery order regarding claims of attorney-client privilege. See Livingstone v. North Belle Vernon Borough, 91 F.3d 515, 524 (3d Cir. 1996). The communications with in-house counsel involved here were clearly for the purpose of rendering legal advice and therefor e are privileged. The Tuckers argue that the privilege was waived because in-house counsel reviewed stories "in the r egular course of business." This argument is frivolous. That reporters regularly consult with in-house counsel to discuss potential liability for libel does not thereby deprive those communications of the protection of the attor ney-client privilege. See, e.g., Upjohn Co. v. United States, 449 U.S. 383, 394 (1981) (holding that communications between corporate counsel and a corporation's employees made for the purpose of rendering legal advice ar e protected by the attorney-client privilege); Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d 1287, 1302 (D.C. Cir . 1988) ("Pre-publication discussions between libel counsel and editors or r eporters would seem to come squarely within the scope of the privilege as defined in Upjohn.").

IV.

In sum, we affirm the District Court's grant of summary judgment as to Time and Newsweek , but reverse in part as to Fischbein. We also affirm the District Court's denial of the Tuckers' motion to compel the deposition of the in-house counsel at Time and Newsweek . The case is remanded in part for proceedings consistent with this opinion.

19

NYGAARD, Concurring and Dissenting.

I agree with much of what the Majority says in its well-reasoned opinion for the court. I disagr ee, however, with its conclusion with respect to defendant Richar d Fischbein and therefore respectfully dissent. I conclude that the District Court did not err; that a reasonable jury could not find that Fischbein acted with actual malice when speaking to Time magazine reporter Belinda Luscombe; and, that summary judgment should be affirmed in its entir ety.

I begin with the Majority's conclusion that "prior to the service of the Tucker's first Amended Complaint, there is no evidence that Fischbein was informed that Mr . Tucker's consortium claim did not refer to damages to sexual relations." I agree, but I believe that the Majority dramatically understates the point. There is a substantial amount of uncontradicted evidence suggesting that, prior to the filing of their Amended Complaint, the Tuckers did intend to include sexual damages within their loss of consortium claim. For clarity, I will summarize this evidence in list form below:

>I. In his deposition, the Tuckers' attorney, Mr. Angino, stipulated that at the time the suit was commenced, the original complaint itself provided no indication that a claim for interference with sexual relations was not being pursued, and that someone r eading the Tuckers' complaint might assume that it alleged damage to sexual relations. (App. 566-70). In my opinion, unless otherwise stated, it is axiomatic that a loss of consortium claim includes a claim for loss of sexual relations.

>II. Mr. Angino also admitted in his deposition that when the suit was initiated, he was not sur e whether the Tuckers sought recovery for damage to their sexual relations. (App. 576). He stated that "the purpose of the consortium count was to cover everything . . . every way in which Mr. Tucker was affected, every way." (App. 575). The r ecord does not contain any facts to the contrary.

>III. The Tuckers themselves have failed to state, either in their depositions or in affidavits, that they had

20

ruled out any facet of their consortium claim at the time they originally filed it.

IV. The report of Dr. Har old Mignott, Mr. Tucker's physician, reveals that Mr. Tucker had"a significant amount of difficulty with impotence" at the same time that he suffered a "significant amount of stress" resulting from the "harassment" and "investigation" of both himself and his wife. The report was dated approximately one month before the Tuckers filed their claim for loss of consortium. (App. 583).

V. On July 31, 1997, the Tuckers issued a news release about the Tucker II lawsuit. 7 Nothing in the press release disclaimed damages for inter ference with sexual relations. (App. 2072-73).

VI. After observing the media's reaction to the consortium claim, Mr. Tucker had the opportunity in at least three separate interviews to clarify that he and his wife were not seeking compensation for injury to their sexual relations. Instead, Mr . Tucker confirmed in all three interviews that interference with sexual relations was indeed an element of their claims. (App. 1630-31; 2142-43; 2145).

VII. On August 13, 1997, in an interview with Philadelphia Weekly, Mr. Angino had a similar opportunity to clearly state for the public r ecord

_____

7. The complaint in Tucker II is itself a confusing farrago of missteps and
errors. Appellants' attorney never discussed the loss of consortium claim with the Tuckers. (App. 518). The complaint was drafted by a law student. It misrepresented one song by taking "snippets of words from actual lyrics, words that are separated by many, many verses and run[ning] them together as if they are a continuous statement," creating what appellants' attorney now admits was "a gross and deliberate misrepresentation." (App. 534). The appellant's attorney neither listened to nor read the lyrics of the song that he alleges was defamatory. He never conducted a fact check of any of the critical allegations in the complaint. Indeed, he did not even sign it, nor is it clear from the record
that he even read the final draft. His wife (who is not an attorney) signed
it for him.

21

that the Tuckers were foregoing any claims stemming from interference with sexual relations. However, Mr. Angino failed to do so. Instead, he stated that loss of consortium "is a standar d addition to lawsuits of this type and refers to all aspects of the marital relationship, not necessarily sex." (App. 2148-49) (my emphasis).

VIII. On August 21, 1997, the Tuckers issued yet another press release. It again failed to disavow any claim arising out of Mr. Tucker's impotency or injury to the Tuckers' sexual relationship. Instead, the release confirmed the existence of such a claim and expressed the Tuckers' frustration that too much of the media's attention was focused on that aspect of the case: " `All the media gleefully jumped on the so-called sex part in the suit that called attention to loss of consortium, which was put in there by my husband Bill, not by me,' [Mrs. Tucker] added, obviously nettled." (App. 464).

IX. The Tuckers have admitted that neither they, nor Mr. Angino, nor anyone on their behalf, ever called Fischbein, at any time, to correct his misunderstanding of the Tuckers' loss of consortium claim. (App. 571, 1968).

The Tuckers have failed to provide any evidence, other than the language in their Amended Complaint, to suggest that they did not intend to claim loss of sexual r elations. Instead, it is obvious to me that the statements made by the Tuckers and their attorney were deliberately cagey and equivocal so that they could, if they wished, intr oduce evidence of impotence and sexual dysfunction at trial.8

In spite of substantial evidence to the contrary, the Tuckers still claim that all of Fischbein's statements were made with actual malice; that is, with the "knowledge that
_____

8. Another way of approaching this issue is to ask whether at trial, given the general loss of consortium that the Tuckers originally alleged, it would have been proper for the District Court to allow introduction of evidence of Mr. Tucker's sexual dysfunction. The answer clearly is yes.

22

[they were] false or with reckless disregard of whether [they were] false or not." New York Times v. Sullivan, 376 U.S. at 279-80. According to the Majority, the Tuckers present two independent arguments in support of their position. Although I remain unconvinced that they clearly articulate even one, I will, for the sake of discussion, addr ess both arguments in turn.

First, the Tuckers seem to suggest that Fischbein's legal training put him on notice that loss of consortium does not always imply harm to sexual relations. According to their brief:

> Fischbein, who is a lawyer who knows the definition of consortium, knew at the time that he talked to the Los Angeles Times and the Philadelphia News and all of the other newspapers, including Time and Newsweek, that Mrs. Tucker did not claim in the Tucker I complaint that her sex life had been destroyed by the lewd lyrics of Tupac Shakur . . . Certainly a jury could find that Mr. Fischbein's uttering his sexual spin thr oughout this period constituted malice as defined by the Supreme Court.

(Appellants' Br. at 46-47). The Majority quickly dismisses this argument, and there is no need to consider it further, except that I question the Majority's suggestion that Fischbein may have been negligent during the period prior to the filing of the Amended Complaint. Again, I emphasize that all of the evidence before the court indicates that the Tuckers, at least originally, did intend to pursue damages for loss of sexual relations. It is har d for me to imagine how Fischbein may have been negligent in any way.

Until this point, my concerns with the Majority's opinion have been fairly minor. I strongly disagree, however, with its disposition of the Tuckers' second main argument. According to the Majority, the Amended Complaint clearly disavowed any intent to pursue damages for loss of sexual relations. As such, a jury could find that Fischbein had read the complaint, and that his subsequent comments to Time magazine constituted actual malice.9 Although I

_____

9. I agree with the Majority that a r easonable jury could find, in light of
the high stakes surrounding the law suit, that Fischbein had read the

23

readily admit that this position is mor e compelling than the Tuckers' first argument, I still cannot agr ee. The language of the Amended Complaint, by itself, is simply insufficient to convince a reasonable jury, under a clear and convincing evidence standard, that Fischbein had actual knowledge that the Tuckers were not seeking to recover damages for loss of sexual relations

Before explaining my position, I want to be absolutely clear about two points. First, I agree with the Majority that, other than the Amended Complaint, "there is no evidence" that Fischbein acted with actual malice.10  Thus, even under

_____

Amended Complaint prior to his interview with T ime. I disagree, however, with the Majority's conclusory statement that "it would be hard to interpret the First Amended Complaint any other way." In light of the Tucker's previous statements, and their penchant for ambiguity, I do not believe that a reasonable jury could establish actual malice based solely upon the Tuckers' five line paragraph.

10. The Tuckers contend that they indicated, thr ough personal interviews and statements by their attorney, that they did not intend to allege loss of sexual relations. This is simply not supported by the record. For example, in their Second Amended Complaint, they claim that their attorney told a Newsweek Reporter"unequivocally that the complaint did not allege . . . that the actions of Defendants related in the [original] complaint had anything to do with their sex life." (App. 24). Their attorney's signature appears on this complaint. During his deposition, however, Mr. Angino admitted that, "I said only in the rarest of cases would you have a count that actually involves sex. I'm under oath, so I cannot say to you that I said specifically, this case does not involve sex." (App. 646). This is but one of many examples where The Tuckers were vague and ambiguous in their public statements and in their declarations to this Court. The Tuckers also argue that the Webster's dictionary definition of consortium supports their case. (App. 25). I did a quick check to verify this claim. Using the Internet (see www.dictionary.com, accessible via www.websters.com), I obtained the following definition of consortium:

> 3. Law. The right of a spouse to the company of, help of, affection of, and sexual relations with his or her mate.

Unless this definition has changed radically in the past three years, Webster's cuts strongly against  the Tuckers. In sum, none of this "evidence" is sufficient to persuade a r easonable jury that any of the defendants acted with actual malice in "misinterpreting" the Tuckers' claims.

24

the Majority's decision, the Tuckers' entir e claim rests solely upon the language in the Amended Complaint. As the Tuckers admit in their brief, only two paragraphs, out of the seventy-one contained in the complaint, addr ess the question of sexual relations:

> 45. Defendant [Fischbein] has continued to defame and harass plaintiff by holding her up in a false light even after the complaint in this matter was filed on June 21, 1997.

> 46. Defendant Fischbein made false and misleading statements regarding the claim [asserted in the original complaint], through published statements that C. Delores Tucker filed suit because of a "loss of her sex life." The statement was untrue, and defendant Attorney Fischbein should have known it was untrue.

(App. 1711-12). Second, the Tuckers filed the Amended Complaint on August 27, 1997. The only statements made by Fischbein after that date, and thus the only potentially actionable comments, were those to T ime magazine reporter Belinda Luscombe. I agree with the Majority that all other comments were made without actual malice. Thus, the question over which the Majority and I disagr ee is a fairly narrow one, and I would characterize it in the following manner: After all of the Tuckers' actions and comments to the contrary, did the language in the Amended Complaint sufficiently clarify the parameters of the loss of consortium claim so that a reasonable jury could find that Fischbein's comments to Time magazine were made with a reckless disregard for the truth? I strongly believe the answer is no.

The language of the Amended Complaint, in the context of the Tuckers' previous statements and actions, was insufficient to indicate a change in their attitude toward alleging a loss of sexual relations. In spite of all the media attention, and all the harm that it supposedly caused, the complaint failed to contain a simple, categorical statement that the Tuckers were foregoing any claim for interference with sexual relations. Instead, it continued to allege that Mr. Tucker had "suffered a loss of . . . consortium," using the very same language that was contained in the original

25

Tucker II complaint. (App. 1713). The only addition was a short paragraph stating that Mrs. Tucker did not file the original suit because of a loss of sexual relations. It said nothing about Mr. Tucker, who had originally filed the loss of consortium claim. And, as their own attor ney testified, "when you damage one spouse, you damage the other spouse in each and every way." (App. 566). My conclusion is underscored by the fact that one month later , and simultaneous with the filing of the complaint at issue in this appeal, the Tuckers filed a Second Amended Complaint to Tucker II, in which they unequivocally stated, for the first time, that they were not seeking damages for interference with sexual relations. This came far too late to serve as an effective form of notice to Fischbein. 11

Even if the language of the complaint did clearly communicate the Tuckers' position, as the Majority so holds, it is not clear to me that this evidence by itself is enough to support a jury's finding of actual malice. I am

_____

11. With regard to the gravamen of this Second Amended Complaint, plaintiffs' attorney responded as follows in his deposition:

        Q. And why did you feel there was a need to have -- to file a
        Second Amended Complaint?

        A. I couldn't believe how dense the defense wer e.

        Q. And in the Second Amended Complaint, you placed a dictionary
        definition of consortium; is that correct?

        A. That was a joke. It was really a joke.

        Q. Well, wait a minute, sir. Ar e you saying that you were
        perpetrating a joke in a Federal Court Complaint; is that what
        you are telling me?

        A. That's what I'm telling you. I said if I had to actually give
you a
        dictionary definition. . .

        Q. So you were -- you were playing ar ound a little bit in a
Federal
        Court Complaint; is that correct?

        A. I was saying look consortium means this.

        Q. So you were playing around a little bit.

        A. You -- you might say that.

App. 829-30.

deeply troubled by the fact that, in spite of intense media scrutiny and its concomitant pressures, the Tuckers never publicly clarified the nature of their suit or contacted Fischbein directly, until they filed the complaint in this case. In short, they did nothing to curb public scrutiny other than amend their original complaint to include new claims. After the numerous public comments and accusations by the Tuckers, it is simply unr easonable to require Fischbein to infer solely fr om the language of the Amended Complaint that the Tuckers had changed their position.

Finally, even if the Amended Complaint by itself was enough to support a jury finding of actual malice, I do not believe that Fischbein's comments were r eckless. As previously discussed, the only comments made subsequent to the filing of the Amended Complaint wer e those to Time magazine on September 12, 1997. According to Luscombe's uncontradicted notes and testimony, Fischbein stated only that Tucker II "was brought for emotional distress and that part of that was that her sexual relationship with her husband was affected." (App. 2197). T ime magazine did not quote Fischbein, and Luscombe's article relied heavily upon seven previous articles, all published in r espected sources from Rolling Stone to The W ashington Post prior to the filing of the Amended Complaint. I find it ironic that the Majority believes there could be actual malice in a statement so similar to one attributed to Mr. Tucker in The Philadelphia Tribune (my emphasis):

> Pointedly asked how the lyrics could affect his sex life, he said, `That's just a brief reference[in the lawsuit] – a small part of it. We have to r epresent the situation as accurately as we can and the only way to experience it is to have it happen to you.'

As previously discussed, in addition to this statement, there is a substantial amount of evidence that indicates that the Tuckers originally did bring their suit, at least in part, to recover for loss of sexual relations. Regardless of whether they later changed their position, a literal r eading of Fischbein's statement to Time r eveals no "reckless disregard for the truth."

27

The record demonstrates that Fischbein, at the time of
his conversation with Time magazine, (1) was not aware
that the Tuckers intended to relinquish their claims for
interference with sexual relations, and (2) even if he was,
his comments were not reckless. As a r esult, I conclude
that the Tuckers cannot meet their burden of
demonstrating facts sufficient to show that Fischbein made
any statements that he suspected were false. As such, I
would affirm the grant of summary judgment in its entirety.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit