**UNITED STATES of America, Plaintiff,**

v.

**Patrick HOUSTON, Defendant.**

**No. 01–20199–C.**

United States District Court, W.D. Tennessee, Western Division.

Filed: June 7, 2002.

Tony R. Arvin, U.S. Attorney's Office, Memphis, TN, for plaintiffs.

William D. Massey, Memphis, TN, John E. Herbison, Nashville, TN, for defendants.

## ORDER DENYING DEFENDANT'S "MOTION FOR NEW TRIAL AND/OR FOR JUDGMENT OF ACQUITTAL"

CLELAND, District Judge.

### I. BACKGROUND

On the morning of January 19, 2001, Defendant Patrick Houston was driving his black Cadillac Escalade SUV and was stopped by an officer of the Memphis, Tennessee Police Department because he was exceeding the speed limit and because there had been a general police alert concerning "several Cadillac Escalades" recently reported as stolen from local dealerships. As the officer approached the driver's door, he saw through the rear seat's window what appeared to be the butt of a firearm protruding from the map or storage pocket situated on the back of the driver's seat.

Without alerting Houston to what he had seen, the officer asked Houston to step from the vehicle. After receiving Houston's identification and having some preliminary discussion at or near the police car, the officer asked for permission to search the vehicle, and Houston consented. The officer retrieved the firearm and brought it to the police car. Another officer came to the scene and in doing a more complete search found a second, smaller firearm hidden under the floor mat at the driver's feet. Both firearms were loaded. After being given *Miranda* warnings, and confronted with the evidence, Houston admitted that the guns were his and said that he "needed them" for personal protection since the business he was in, making rap music, was "dangerous." He claimed to have bought one gun "off the street" and the other through a girlfriend. He expressed concern about his parents finding out, and worried aloud that this event would ruin the chances for success of his next recording, soon to be released, and violate his parole.

At trial, Houston chose not to testify, but produced the original purchasers of the firearms, both of whom were long-time friends of Defendant and occasional employees of Defendant's recording company.[1] The witnesses said that Tobert Carruthers had been in possession of Houston's vehicle from the previous day because Houston did not want a certain woman to see Houston's vehicle at Houston's house, and thus learn that he was at home. The witnesses said that Clarence Edwards was picked up by Carruthers at his house and then they both proceeded to pick up Houston. They all then drove to

---

1. The company is owned by Defendant's brother, Jordan, but testimony at trial suggested that Defendant Patrick Houston is the principal artist and "money maker" for the firm. The company was often referred to at trial as "the Defendant's."

a Memphis mall to visit a tuxedo rental store.

Both Edwards and Carruthers testified that they had lawfully purchased the firearms. Carruthers testified that he had carried his firearm to the vehicle the previous evening while preparing to drive his wife and young children to dinner and a movie, then hid the firearm under the floor mat and forgot it was there. He said that he did not tell either Houston or Edwards that the firearm was present.

Edwards testified that he brought his firearm out to the vehicle that morning, partially concealing it in a zippered calendar or "day-planner" case. He had it because he intended to go to a practice range later that day and use it; he said that this was first time in the years since he had purchased the gun that he had brought it out of his house. He said he did not tell Carruthers or Houston about the firearm being present.[2]

After trial by jury on two counts of the indictment charging him with being a felon in possession of a firearm, Houston was convicted. The verdict was received on March 13, 2002, and on March 20, 2002, Defendant timely filed a Motion for New Trial and/or For Judgment for Acquittal. Defendant further received the leave of court to supplement the motion after the transcript became available.

## II. STANDARD

■ A motion for Judgment of Acquittal is made under Fed.R.Crim.P. 29(a), which provides that a district court may enter a judgment of acquittal "if the evidence is insufficient to sustain a conviction" on the challenged counts. A motion for a judgment of acquittal must be granted if "there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a

reasonable doubt." *Curley v. United States,* 160 F.2d 229, 232–33 (D.C.Cir. 1947); *see United States v. Gaines,* 353 F.2d 276 (6th Cir.1965); 2 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 467 at 658–59 (2d ed.1982). This standard has been approved by the Supreme Court as "the prevailing criterion for judging motions for acquittal in federal criminal trials." *Jackson v. Virginia,* 443 U.S. 307, 318–19 n. 11, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ If the evidence and reasonable inferences from the evidence, taken in a light most favorable to the government, allow the court to conclude that a reasonable mind might fairly find guilt beyond a reasonable doubt, then the issue is for the jury.

■ That the evidence was exclusively circumstantial is not fatal to the government's position so long as the evidence does not require too great a "leap of faith in order to support a conviction." *United States v. White,* 932 F.2d 588, 590 (6th Cir.1991); *see also United States v. Stone,* 748 F.2d 361, 362–63 (6th Cir.1984) ("[C]ircumstantial evidence alone can sustain a guilty verdict and . . . to do so, circumstantial evidence need not remove every reasonable hypothesis except that of guilt.").

■ A motion for new trial may be granted on a defendant's motion "if the interests of justice so require." Fed. R.Crim.P. 33. The motion is committed to the sound discretion of the trial court, *United States v. Willis,* 257 F.3d 636, 642 (6th Cir.2001), even where the new trial is sought as a remedy for cumulative error that resulted in a fundamentally unfair proceeding. There is a judicial interest in the finality of proceedings. *United States v. MacDonald,* 435 U.S. 850, 853–54, 98

---

**2.** Carruthers said that he knew he was going to go with Edwards to a firearms practice

range, but did not know that Edwards's firearm was in the vehicle that morning.

S.Ct. 1547, 56 L.Ed.2d 18 (1978) ("The rule of finality has particular force in criminal prosecutions because 'encouragement of delay is fatal to the vindication of the criminal law.' ") (quoting *Cobbledick v. United States*, 309 U.S. 323, 325, 60 S.Ct. 540, 84 L.Ed. 783 (1940)); *see also United States v. Bilsky*, 664 F.2d 613, 615 (6th Cir.1981) (The "swift and efficient administration of justice is in the interest of both society and accused."). Accordingly, motions for a new trial are generally disfavored. *United States v. Seago*, 930 F.2d 482, 488 (6th Cir.1991) (citing 3 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 557 at 315 (1982) ("No court wishes a defendant to remain in jail if he has discovered evidence showing that he is not guilty, but after a man has had his day in court, and has been fairly tried, there is a proper reluctance to give him a second trial.")). The defendant bears the burden of showing that a new trial should be granted. *Id.*

### III. DISCUSSION

First, Defendant moves for judgment of acquittal, based on the claim that the evidence is insufficient to prove the charges beyond a reasonable doubt.

Second, Defendant moves for new trial on one or more of the following fourteen bases:

1. Voir dire questions that "stirred patriotic feelings regarding being an American." This, Defendant alleges, was connected by the court with the identification of Assistant U.S. Attorneys as "representing the people of the United States."

2. Elimination as a potential juror of a Mr. Holmes, a bail bondsman.

3. Voir dire questions relating to "gangsta rap" music and the group "Three–Six Mafia."

4. The government's cross examination of defense witness Carruthers.

5. The court's pretrial ruling that if the defendant were to testify, he could be questioned about certain of the song lyrics he had written.

6. The court's "judicial notice" of the "gangsta rap" musical genre.

7. Evidence admitted concerning Defendant's parole status.

8–9. The court using illustrations of witnesses to a traffic accident while describing to the jury credibility issues, and the court "failing to amplify the distinction between" preponderance of evidence and beyond a reasonable doubt.

10. The court "singling out" defense counsel for criticism during final instructions.

11. The court's failure to remind the jury during deliberations that certain police reports had been spoken of by a witness or witnesses during the trial.

12. The decision of the court to refer the jury to certain testimony of defense witness Edwards during deliberations.

13. Failure of the court to elicit sufficient information during voir dire.

14. The cumulative effect of combined errors denied Defendant a fair trial.

### A. Motion for Judgment of Acquittal

Defendant's motion for acquittal alleges that the evidence *in toto*, even in a light most favorable to the government, was insufficient to convict.

The evidence, however, clearly showed that both firearms were hidden within easy reach of the driver's position in Defendant's vehicle, and that Defendant was the sole occupant of the vehicle. The testimony of the arresting officer also indicated that Defendant admitted possession of the firearms. A reasonable juror could have

credited the officer's testimony in this regard. The prior conviction and the interstate nexus were agreed to by Defendant on the record.

Also, the court notes that incredible testimony offered by defense witnesses may be considered by the jury, and may add to the weight of the court's determination of an "overwhelming" case for the government. *See United States v. Garcia and Wolfe*, 866 F.2d 147, 152 (6th Cir.1989) (defendant claimed evidence insufficient to prove constructive possession or knowledge of cocaine, but "because [he] chose to testify, the jury had an opportunity to judge his credibility, and was entitled to consider any lack of credibility in reaching its verdict"); *see also United States v. Cotton*, 770 F.2d 940, 945 (11th Cir.1985); *United States v. Tyler*, 758 F.2d 66, 69 (2d Cir.1985).

As stated in Background, *supra*, Carruthers and Edwards, employees/drivers for Houston, said that Defendant accompanied them to a tuxedo store where Carruthers was to be fitted that morning. Each said that he had independently carried his firearm to Defendant's vehicle and stashed it there out of sight without informing anyone.

A jury could readily conclude that the Carruthers and Edwards testimony about the tuxedo store trip was false. Store records flatly contradicted their testimony about Carruthers being fitted for a tuxedo that day. The records showed that he was indeed fitted at that store, but not until Monday, February 5, 2001, more than two weeks after the January 19 arrest. As of the day of the arrest the wedding party had not yet even registered there.

Also potentially problematic for a jury was Carruthers' explanation about just where "under the mat" he hid his gun. He pointed to the slanted area under the dashboard nearest the brake and accelerator pedals, the area farthest from the driver's reach, whereas the officer who found that gun said it was located on the flat area near the rear edge of the mat and within easy reach of a driver. Although Carruthers said he left the gun there "fully loaded," there was one discharged round.[3]

Finally, the jury was entitled to look mistrustfully at Edwards' story that he was merely heading to the pistol range that day, in that he claimed to have carried the .44 from his house, loaded, for the very first time "in [his] life" that morning and then forget to announce to anyone that it was there, hidden in the pocket behind the driver. Like Carruthers, Edwards pointed out as his chosen hiding place an area of the vehicle somewhat different from that noted by the seizing officer. Edwards said the gun was well inside the rather spacious pocket, out of sight and at the bottom, while the officer said when he first saw it, it was neatly wedged into the upper right corner of the pocket near the seat edge.

■ In sum, the Carruthers/Edwards story about their separate, simultaneous and unrevealed placement of two guns in one vehicle was, in the court's opinion, a much-too-convenient coincidence, and transparently false.[4] The jury could have

---

3. The discrepancy could indicate either that it was not Carruthers who hid the gun, or that if it was he, someone else (perhaps the defendant) found it and discharged it in the meantime. It could also indicate that the officer who found it (who was not the arresting officer) was mistaken in his recollection or even lying, but no motive for this possibility was suggested.

4. Perhaps representing nothing more than an interesting coincidence (and not explored at trial) the Carruthers/Edwards story that first emerged at hearings in early March, 2001 was uncanny in its similarity to the theme of a then-current and very well-publicized trial of another rap music figure, Sean "Puffy" Combs, charged with the illegal possession of a firearm found in a vehicle. In that trial, Wardell Fenderson, one of the musician's ac-

so concluded as well, but even if they did not, the evidence was amply sufficient and the motion for judgment of acquittal must be denied.

## B. Motion for New Trial

### Grounds 1. and 13. Were the court's voir dire questions insufficient or such that they "stirred patriotic feelings"?

In his "Memorandum in Support of Motion for New Trial," Defendant withdrew the objections asserted in Ground 1 after his "closer review of the transcript."

■ Defendant asserts under Ground 13 that the voir dire questions were "insufficient." This point was raised in the first motion and brief but not elaborated upon in the supplemental brief, and is not supported by any citation to the record. A review of the record reveals that the defense attorney was specifically given the opportunity, out of the hearing of the jury, to suggest "any additional questions or follow-ups for any of the jurors," and did not do so. (Tr.Vol. 1, at 60.) No basis for a finding of prejudice is made out.

### Ground 2. Was a potential juror improperly excluded by the court?

Defendant here complains that a potential juror, who was employed as a bail bondsman, was improvidently eliminated as a potential juror by the court while a

companying employees/drivers, claimed ownership and possession of the firearm. He later recanted and said he had been paid by Combs to falsely take responsibility. The Combs trial began with opening statements on January 29, 2001 and the verdict was returned on March 16. See Harriet Ryan, *Chauffeur is unflappable during cross-examination,* CourtTV.com, Trial Report, February 16, 2001 <http://www.courttv.com/trials/puffy/021601—ctv.html>:

[Wardell] Fenderson was driving Combs' souped-up SUV Dec. 27, 1999, when Combs

woman whose husband was a probation officer was improperly retained. These complaints are unavailing. The court was exercising its judgment as to the ability of a person to serve in a criminal trial impartially in view of personal experience.

It was the court's observation that a bail bondsman is almost constantly involved in a tenuous and often contentious relationship with those charged in criminal cases. The security of the bondsman's personal assets is dependant on those bonded to show up for further court proceedings, and the bondsman is sometimes required to act as a law enforcement officer would, that is to seek out and arrest the bonded defendant and bring him before the court in the event that he has absconded.

These attributes of a bondsman are commonly known, and not any form of speculation (least of all "the *rankest* of speculation," as Defendant heatedly contends in his supplemental brief (emphasis added)). *See, e.g., Lund v. Seneca County Sheriff's Dept.,* 230 F.3d 196, 197 (6th Cir.2000) ("[A] bondsman can go anywhere in the United States and arrest his fugitive at any time. It matters not if he ... forces his way into a third party's home or if he forcefully seizes his fugitive. The bondsman is basically permitted to break the law to re-arrest his fugitive.").

■ Given the facts of the case, the court quickly concluded that permitting a bail bondsman to serve as a juror would

and his companions fled a gunfight at a Times Square disco. When police found a gun in the getaway car, Fenderson was arrested for weapons possession along with Combs, his then-girlfriend Jennifer Lopez and bodyguard Anthony "Wolf" Jones.

He later told the prosecution that Combs and Jones were armed the night of the shooting and had offered him $50,000 to take the rap for a 9mm semiautomatic gun found in the SUV. He said that, although he initially accepted the bribe and confessed to police, he soon changed his mind.

pose a significant risk to the interests of Defendant in a fair trial. Defendant's current allegation that a bail bondsman would have "potential empathy for an accused person" is, in the court's view, unfounded in either reason or experience.

In comparison, the woman the court allowed to continue as a potential juror was not employed in the criminal justice system or in personal contact with those accused of crime, but merely married to a man who had been a probation officer for about eighteen months; she said that she rarely discussed with her husband his defendants' situations, and she specifically committed herself as one able to be fair to Defendant. In addition, there was no objection from either party at the time that the court excused the bondsman, nor any further questions suggested that should be put to the woman suggested by Defendant at that time.

The court is not persuaded that any prejudice arises from these allegations.

### Grounds 3. and 6. Was the court's use of the term "gangsta rap" during voir dire improper?

Defendant reprints in his supplemental brief the court's brief inquiry in regard to any juror's "connection with, affiliation with, business interest or generalized interest in rap music, particularly 'gangsta' rap music," complaining that the questions were improper and that the use of the phrase "gangsta" (or "gansta," see discussion at footnote 16, *infra*) was unfair.

One potential juror responded, as noted in the transcript, and neither with him nor with any other juror was there any further inquiry on this point, nor any problem with impartial jury service noted. Defendant apparently argues that the mere use of the phrases "rap" and "gangsta" was somehow prejudicial to the defendant's rights. Defendant fails to recognize, however, that it was he who, by his statements to the arresting officer, injected into the case the topic of rap music, rap musicians and the danger that he alleged was inherent in the business. (*See* McCord Test., Tr.Vol. 2, at 22 ("He told me he needed [the guns] for personal protection because he was a rapper by trade and that the rap business was a dangerous business.").)

Although Defendant apparently did not use the word "gangsta" with the officer to describe his rap, the court reviewed various of Defendant's song lyrics in the course of pre-trial motions, and knows that "gangsta" is a word used in at least one song or recording title. "Gangsta rap" is used for the general description of Defendant's recordings, according to widely-published sources.

Thus, in an effort to detect whether any potential juror might have an unusual affinity for, or aversion to rap music, especially the "gangsta" variant, the questions were posed. No accusation of Defendant was stated or implied; only jurors' experience and attitudes were sought and obtained. Little was revealed, as the record shows.

To the extent that Defendant argues that the court improperly took judicial notice of a fact, the argument is unconvincing. Defendant argues the irrelevance of the fact noticed, but there are two problems with the argument: first, the court did not take judicial notice of any such fact for trial purposes; second the existence of "gangsta rap" is not irrelevant to the selection of a fair and impartial jury.

It is true that the court used the phrase "judicial notice" in its discussion with the attorneys on this topic, outside the presence of the jury, because the existence of the musical genre is simply beyond dispute. This, however, was not "judicial notice" as the phrase is commonly known, and was spoken only in support of the court's determination direct questions to potential jurors concerning the subject. If a juror had revealed that he or she was a

highly-motivated Patrick Houston devotee, or on the other hand was opposed to any form of rap music on religious or moral principles, Defendant cannot reasonably argue that the information would not have been important to the attorneys selecting the final jury.

The court at no time communicated to the jury anything resembling a judicially-noticed "fact" of the existence of "gangsta rap" music, nor did the court at any time either articulate or imply any criticism of the genre itself. To the extent that Defendant assets that there exists no recognizable musical genre known as "gangsta rap," his own recording "We Can Get Gangsta,"[5] along with many other publically-available resources, stands in contradiction.

 The court is granted broad discretion in the phrasing of voir dire topics and questions. *United States v. Blanton,* 719 F.2d 815, 822 (6th Cir.1983) ("The United States Supreme Court has *not* established any per se rule which it requires trial judges to follow in the voir dire of a jury venire.... These opinions [of the Supreme Court] emphasize the necessity of the exercise of trial judge discretion concerning the problems actually confronting him.") (emphasis in original) (internal citations omitted). Here, the court finds that the questions asked, in context, were proper, limited and not prejudicial.

## Grounds 4. and 5. Did the government improperly cross examine defense witness Carruthers regarding song lyrics and guns?

Defendant complains that the government's cross examination of witness Carruthers was improper, in part, to the extent that it called to his attention certain song lyrics purportedly written by the defendant. Defendant relatedly asserts, but does not support, a contention that the court should not have permitted Defendant to be cross-examined about those lyrics.

In response to a motion to confine the topics on which the Defendant could be cross-examined if he testified, and in response to a question from the court as to whether there could be a final ruling without the court having heard the Defendant's direct testimony, the government agreed to "not pursue this [song lyric] line of questioning" without permission from the court. The court should wait, the government asserted, until Defendant's direct testimony had been concluded, and then determine what the limits of government cross-examination should be. The court and Defendant agreed. The defendant did not testify, and was not examined about song lyrics. His complaint about such cross-examination being permitted is therefore illusory.[6]

**5.** See Soren Baker, "Recordings," Chicago Tribune, Sunday, February 25, 2001 ("[Project] Pat presents detailed, often-chilling tales of life on the streets of his native Memphis. He excels at grisly crime tales, with *'We Can Get Gangsta'* and *'Cheese And Dope'* as captivating as a top-notch gangster movie.").

**6.** It is likely that the government could have introduced the evidence under 404(b), F.R.E., as circumstantial evidence tending to show knowledge or absence of mistake, independently of whether the defendant testified. *See United States v. Foster,* 939 F.2d at 445 (7th Cir.1991) (defendant challenged use of his rap music lyrics in government's case in chief, but court of appeals upheld introduction of evidence, accompanied by limiting instruction: "the rap verse was not admitted to show that [the defendant] was, in fact, 'the biggest dope dealer' [as lyrics stated]; it was not admitted to establish that [he] was the character portrayed in the lyrics.... [The defendant] exhibited knowledge of an activity that is far from fictional. He exhibited some knowledge of narcotics trafficking, and in particular drug code words.") *Id.* at 445, 456. *See also United States v. Louis,* 814 F.2d 852, 856 (2d Cir.1987) (upholding admission of similar act evidence, phone conversation using code to

There was no agreement nor any ruling known to the court relating to the scope of cross examination of Carruthers, or any other witness, or pertaining to song lyrics or song titles. Carruthers took the stand and claimed that one of the guns was his, and that he had purchased it on his own account (not, as the government theorized, as a surrogate for Defendant). He said that he had hidden the gun in Houston's vehicle without telling him.

Assitant U.S. Attorney Arvin, on cross examination, asked Carruthers why he had purchased the gun. Carruthers said, "because I like guns." (Tr.Vol. 2, at 195.) Arvin then asked if the defendant also "likes guns," and Carruthers said "no." *Id.* With that, Mr. Arvin asked if Defendant writes songs about guns, and there was an objection from defense counsel, the stated basis for which was "relevance." The court overruled the objection, but cautioned the government attorney with the added statement, "for the moment."

Government counsel continued with questions about songs, and the witness said he didn't know. This was pursued by further questions, each one testing the witness's previous claim of no knowledge, and the witness, who had known Defendant for thirteen years, who worked part time for Defendant's recording company and did driving and other work for Defendant's concert tours, soon said, somewhat surprisingly, "I don't listen to his CD's … I've listened to a couple of songs, but I haven't listened to his whole CD." All the foregoing was done without further objection.

When Carruthers was asked whether the lyrics were about guns, he responded that they are about women, and that the only songs he listens to are the ones on the radio. Mr. Arvin then asked about a particular Houston song, "Murderers and Robbers," and this drew a second objection from defense counsel. When the court asked Mr. Arvin the point of the question, Mr. Arvin simply decided to end this phase of his inquiry.

Defendant now characterizes the government's examination as a failure to comply with the earlier commitment to not inquire of Defendant without consent of the court. The court does not agree.

Whatever point or points may have been intended in the Carruthers cross examination, the questioning was unable to produce any evidence that Defendant wrote songs about guns or violence, or even that Defendant "likes" guns. The court instructed the jury that the only evidence comes from the witness's testimony, not from questions asked by an attorney,[7] Carruthers steadfastly declined all invitations to agree with Mr. Arvin.

The relevance of the questions, as provisionally determined by the court "for the moment" was based in the right of the government to cross examine and test the credibility of a witness who says that he "knew" that Defendant had no knowledge of the firearm's presence in his vehicle. On Carruthers's direct examination, (Tr. Vol.2, pp. 151–155), he repeatedly told the jury that Defendant had no way to know about the gun, as follows:

show knowledge that defendant was discussing drugs in current offense).

The defense in the instant case as described in Defendant's opening statement was that his possession of the firearms was not "knowing," but inadvertent and accidental. Thus, under Rule 404(b), evidence of defendant's statements in the form of music lyrics expressing knowledge of or affinity for the pos-

session or use of various handguns could be probative of either his "knowledge" of the firearm's presence, or an "absence of mistake or accident" in his possession of them.

7. See, e.g., court's preliminary instructions Vol. 1, at 74–75: "What the attorneys say is not evidence."

Q When Mr. Houston got in the ·car, did you tell him that .22 pistol of yours was in the car?

A No.

. . .

Q And was that little .22 pistol yours?

A Yes, sir.

Q Did you—did Mr. Houston ever ask you if this gun was n that car?

A No.

Q To your knowledge, has Mr. Houston ever seen you with this weapon before?

A No.

. . .

Q Are you here to help out Patrick Houston?

A I'm just trying to take responsibility for my actions that I did. . . . He didn't even have no knowledge of that gun.

It was the court's opinion that Mr. Arvin was entitled to inquire, to a reasonable extent, in an effort to test the authenticity of those statements, purporting as they did to reveal the mental state—i.e., absence of knowledge—of Defendant. The examination was fruitless in any event, and the inquiry was brief. It terminated before any display of specific or graphic lyrics (which the court knows from its review of pretrial motions to have been readily available to the government).

Finally, the court offered the defense an opportunity to propose a cautionary instruction, and the court gave an instruction substantially as drafted by Defendant. The instruction referred the jury to questions that contained "what were supposed to have been certain rap music lyrics," and directed the jury to

avoid using in your deliberations any possible preconceived notions . . . regarding rap music performers, musicians or anyone else in that business. Rumors or possible suspicions about

character and behavior are not proper evidence in a court case.

(*See* Tr.Vol. 3, at 2–3.) This instruction further abated any concern that may otherwise have existed about prejudice based upon questions relating to music lyrics.

■ Upon review, the court finds that there was no unfair prejudice that substantially outweighed the proper and probative purpose of the government being allowed to try to challenge the credibility of an important defense witness's direct testimony that the defendant had no knowledge of the presence of the two guns in his vehicle.

## Ground 7. Was evidence improperly admitted concerning Defendant's parole status? If error, was it harmless?

Defendant next objects that evidence of his parole status was improperly admitted.

After Officer McCord found firearms in Defendant's vehicle, Defendant stated that his possession of these firearms would "violate his parole." Testimony by McCord to this effect was objected to. before trial, and the court ruled in favor of the government's response that the evidence was probative, and not substantially more prejudicial than probative under Rule 403.

The court found that there was probative value in the evidence because Defendant's statement was wrapped up in an admission that showed, first, an awareness of the presence of the firearms. This point was at issue as an ingredient of the required "knowing" possession element, and, because his awareness of the presence of the firearms was now being denied by Defendant, this point was known by the court to be strongly contested.

Also, the court found that the statement indicated immediate consciousness of guilt, *i.e.*, the statement showed that Defendant understood that he was prohibited from firearm possession. The statement could

also demonstrate Defendant's intent and ability to exercise control over the firearms, another of the ingredients of "possession." As stated above, all the ingredients of the element of "possession" were known to be contested issues (the court relied on statements of counsel and, to some extent, upon testimony given in the previous trial).

There was no way to know the degree of Defendant's familiarity with the paper trail associated with firearms purchases, or his impression of how aggressive or uninterested Officer McCord seemed to be at the side of the road, or how easy or complicated it would be for investigators to check the true origin and ownership of the firearms. Thus, Defendant's statements to the officer about how he acquired the firearms (one was supposedly purchased "off the street," and the other "from a girlfriend") and why (for "personal protection" in the music business), in combination with evidence of the actual ownership of the firearms, could indicate an attempt by a defendant who is thinking off-the-cuff to offer partially-false explanations either to minimize the criminality of his possession, or to shield the actual purchasers, his employees, from investigation and prosecution. A "guilty knowledge" relevance determination is thus further supported.

In assessing potential prejudice, the court took into account that the jury would know through Defendant's stipulation that he was a convicted felon, a prior felony conviction being one of the essential elements of the charge.[8] In addition, the court knew that it was highly likely that Defendant would again challenge the lack of any written notation in the officer's written preliminary report about Defendant's purported admissions, and that there would be answering evidence to the effect that the officer had made prior consistent statements in sworn testimony at a parole revocation hearing shortly after Defendant's arrest.

The court found that there was nothing particularly remarkable to the average person about the fact that a man known to have a felony conviction has been on "parole." Parole is a commonly-understood and generally approved re-entry status for those emerging from incarceration. A juror would normally expect some variety of a parole status to follow a conviction and custodial sentence.[9]

The potentially prejudicial nature of a then-current parole status, the court found, was in its ability to convey something about the recency of the underlying conviction.[10] Even considering this, though, the court found that a recent conviction and parole would not be unfairly prejudicial, and not surprising to the jury, given Defendant's youth; i.e., as a man in his mid-to-late twenties, Defendant did not have under his belt very many years of

8. The court notes that no case cited by Defendant in support of his present argument had as the charged offense one equivalent to the one at issue here, i.e., one with the element of a prior felony conviction.

9. The majority of prisoners—78 percent—are released from prison onto some type of conditional supervision status. The Bureau of Justice Statistics estimates that 585,400 prisoners were released in 2000. See A.J. Beck, State and Federal Prisoners Returning to the Community: Findings from the Bureau of Justice Statistics, paper presented at the "First

Reentry Courts Initiative Cluster Meeting," Washington, D.C., April 13, 2000; see also http:// www.ojp.usdoj.gov/bjs/pub/pdf/ sfprc. pdf.

10. Defendant argues that this conclusion is "seriously flawed" because, based on Tenn. Code Ann. § 40–35–102, the average person would know that a person on parole had been convicted of not just a felony, but a "serious or aggravated" one. The court thinks that Defendant ascribes far too much technical legal knowledge to the average person. His argument is unconvincing.

adulthood within which to have committed a predicate felony or felonies.[11]

▮ Ultimately, to the extent that there was a potential for unfair prejudice in this evidence, the court found that the prejudicial impact did not substantially outweigh the legitimate usefulness of the statement, which, if believed by the jury would fully contradict the defense witnesses and factual theory of the case.

▮ Assuming that the court's ruling permitting some mention of Defendant's parole status was erroneous, the court next considers the weight of the evidence in assessing the harmfulness of any error in this regard. Where the evidence against the defendant is overwhelming, an otherwise impermissible remark may be rendered harmless. Fed.R.Crim.P. 52(a); see *United States v. Walker*, 160 F.3d 1078, 1086 (6th Cir.1998) (parole officer's testimony showing that defendant was supervised "on probation … by two different courts for felony offenses," was error, but harmless in combination with overwhelming evidence of guilt); *United States v. Ortiz*, 507 F.2d 1224, 1226 (6th Cir.1974) ("the evidence of appellant's guilt was so overwhelming that this example of overkill could not possibly have influenced the outcome or 'affect(ed) substantial rights' of appellant."); *United States. v. Andrea*, 538 F.2d 1255, 1257 (6th Cir.1976).

This case involved overwhelming direct evidence of Defendant's guilt, including his own admissions, and rebutted only by a story featuring the most transparent and amazingly parallel coincidences, produced by Defendant's friends and employees.[12]

Thus, even assuming that the court's decision was error, and that the mention of a "parole hearing" and parole status in testimony from the officer (or in cross examination of Defendant's witnesses[13]) should not have come to the jury, the error was fleeting, minimal, and harmless.

Further, the court disagrees with Defendant's characterization of the nature and frequency of the parole status evidence. Defendant, in his supplemental brief, argues that the court's treatment of the parole status issue was "just plain wrong," and that the court "let the government get away with" it. Defendant asserts that "the government pounded Mr. Houston at

---

**11.** The court's decision in this regard might have been different if Defendant were a mature, older person, who—in the absence of parole status information—might enjoy the appearance of having committed a predicate felony in his youth and enjoyed years of intervening crime-free behavior.

**12.** Defendant posits that the evidence was sketchy and inconclusive, and holds out as an indication of this point the fact that the first jury was unable to reach a unanimous verdict.

The court finds no support for this contention in the fact of a hung jury, especially in light of the possibility of juror misconduct in the first trial. After a mistrial was declared, the court was informed by a concerned former juror that at least one juror had refused to discuss the evidence or otherwise take part in deliberations, in essence announcing that he/she had made up his/her mind. Although the jury asked questions and continued to deliberate for a lengthy period, that juror would not participate.

The court therefore allowed an exception to the Local Rule that normally prohibits contact with former jurors, thus allowing the parties to investigate possible jury tampering, collusion or other misconduct. Noting further has come to the court's attention in this respect.

**13.** An officer can ordinarily be cautioned and his testimony pre-arranged to avoid certain statements, but the kind of spontaneous, volunteered statements uttered unresponsively by Defendant's own witnesses, see *infra*, cannot be so readily contained. Also, the fact that witnesses who were friends of the Defendant so casually offered their own comments about "parole" is a (small) further indicator of the non-inflammatory, non-prejudicial nature of parole status to an ordinary person.

every turn about his parole status," and that "there is no principled reason for the government to have adduced evidence of Mr. Houston's parole status and then to have browbeaten him [with it] at every turn...." (See Def.Supp.Br. at 22.) Such statements, like many others in the supplemental brief, are either inflated or disingenuous.

The government asked Officer McCord, as noted above, about his testimony in a post-arrest probable cause hearing and a later "parole hearing." The reason for the parole hearing to be mentioned arose in Defendant's opening statement, in which Defendant's attorney accused Officer McCord of not mentioning anything about Defendant's admissions "until five months later [after the arrest] when this matter is about to go federal...." (Tr.Vol. 1, at 102.) Further, the government tested the credibility of the testimony of the defense witnesses by asking, in various ways, "you knew that the defendant, was prohibited from possessing firearms, but you didn't tell him that you had hidden a gun in his vehicle?"

The record reveals that the government did not, in fact, "pound on" or "browbeat the defendant" (or anyone else) with this issue, but rather was fairly circumspect about it. Neither in the government's opening statement nor in its closing argument was the word "parole" articulated. In the government's rebuttal argument, a "parole *hearing*" was mentioned, briefly, in an entirely non-inflammatory manner, designed merely to answer Defendant's implication that Officer McCord had invented Defendant's admission months after the fact in preparation for the federal prosecution.

"Parole" was not even mentioned by the government in its rapid-fire cross-examination of Defendant's first witness, Carruthers. It was that witness himself who, in responding to the government's question as to his knowledge of Defendant's felon status, volunteered that he thought Defendant "was off parole," thus implying that perhaps Defendant would not be a prohibited person if not then on parole. The government attorney did not repeat the "parole" statement of the witness, but remained focused on Defendant's *felon* status and the witness's knowledge of it. Indeed, government counsel actually interrupted the witness just when he was about to repeat the "off parole" statement, and redirected him to his knowledge of Defendant's "felon" status. (*See* Tr.Vol. 2, at 192: 7–8.)

Defendant's other principal witness, Clarence Edwards, was asked, one time, about his prior testimony at the "parole hearing," but only to orient him after he claimed that he could not recall giving testimony "in March of 2001." When the government's attorney reminded him, saying "at a parole hearing," the witness recalled, "Oh. Yes." (Tr.Vol. 2, at 243.)

Later, Edwards (much like Carruthers) was the one to volunteer the word "parole" in clarifying a question about his discussion with Defendant on March 2, 2001: "For a parole hearing?" *Id.* It is true that, with this witness, the government attorney challenged his story by asking as a predicate, "you knew Mr. Houston was on parole" at the time the gun was in the car? When the witness said "yes," the government's challenge focused: "And you didn't think to let him know there might be a loaded gun a few feet away from him?"

■ Thus, the court finds that Defendant's assertion that "the government pounded Mr. Houston at every turn about his parole status" is grossly inflated and unsupported by the record. Although some evidence of a parole status was introduced, it is simply untrue that Defendant was "browbeaten ... at every turn."

**Grounds 8. and 9. Did the court erroneously instruct the jury by including illustrations about witnesses to a traffic accident while describing credibility issues, and by failing to amplify the distinction between "preponderance" and "beyond a reasonable doubt"?**

■ Here, Defendant challenges the specific language employed by the court in using a civil dispute, a traffic accident, in describing to the jury their task in evaluating the credibility of witnesses. The court specifically chose an example "that is nowhere near what we have in this case." (Tr.Vol. 1, at 78.)

After reciting language from several cases that illustrate the importance of clear instructions and the need for the court to retain its impartiality, Defendant accuses the court of speaking to the jury "in code words" because the court used the phrase "childhood friend" in providing the traffic accident witness credibility example. Defendant notes that witnesses Edwards and Carruthers were his friends.

Defendant points to the court's final jury caution about law enforcement witnesses, in which the record shows that the court said that police officers are not entitled to automatic acceptance, but that the jury may consider their training and experience. Defendant argues that these instructions were "not balanced." Defendant finally argues that the instructions "were subtle but pernicious."

The instructions were prepared in consultation with all attorneys, and the record shows that Defendant's requested cautionary supplement and Defendant's "theory of the case" were given much as requested. The record also shows that there was a proceeding out of the hearing of the jury at the conclusion of the instructions, at which Defendant objected to a caution the court gave (discussed at section III B. 10., *infra*), but at which there was no other objection to any instruction. (Tr.Vol. 3, at 98–99.)

In order for the court to provide relief on this basis, an objection is required:

No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection.

Fed.R.Crim.P. 30.

As there was no objection to the charge, apart from the caution discussed below, there can be no later complaint.

**Ground 10. Did the court "single out" and "attack" the defense attorney during final instructions?**

At the conclusion of the instructions, Defendant's counsel argued at the side of the bench (out of the hearing of the jury) that the court had "singled [him] out" for criticism. In the supplemental brief, Defendant goes much farther, charging that the court engaged in a "devastating attack" on Defendant's counsel that was "wholly unwarranted." Defendant alleges that the court "instructed the jury to disregard his statements regarding whether the Defendant was required to consent to a search of his car . . . ." Defendant characterizes this as a "gratuitous and unwarranted personal attack upon Mr. Massey."

Defendant then reproduces the court's first caution to the jury, which clearly does not single out just one, but mentions all three attorneys who argued; Defendant then omits the second, clarifying caution given after consultation. The essence of the court's two concluding cautions was that the jury should simply ignore *any* attorney's argument about what legal standards control the search of a vehicle, because "there's nothing like that before you . . . . That's not before you. You don't have to decide any of those things." (Tr. Vol. 3, at 96.) The court consistently re-

ferred to "those lawyers" and "these attorneys," specifically naming "at least Mr. Massey, and perhaps Mr. Arvin and Mr. Hall." *Id.* The court clearly was relying upon its memory, saying "I think Mr. Massey said something about whether a police officer could properly search. . . ."

The court, after Mr. Massey's objection, gave its clarifying caution that again explained that the first caution was meant to "apply to all the lawyers . . . not just Mr. Massey, but Mr. Arvin and Mr. Hall. . . . I mainly do not want you to be distracted into including in your deliberations the question of whether the officer was right in doing what he did, whether he had the right to go in the car or didn't have the right to go on the car." (Tr.Vol. 3, at 101.)

These cautions were, in the court's opinion, needed in view of the arguments of all counsel, in varying degrees, that might have distracted the jury into considering a purely legal issue.

The court is of the opinion that these cautions were, in fact, even-handed and relatively mild. There was nothing personal or critical about them either in tone or content. The court simply did not "single out" Mr. Massey. These cautions did not in any way resemble a "devastating . . . gratuitous and unwarranted personal attack." [14] Labeling them as "devastating" or "gratuitous" does not make them such. Defendant's argument reveals only hyper-

bole, or perhaps hypersensitivity. It is, in either event, unconvincing.

**Ground 11. Did the court err in refusing to instruct the jury during its deliberations that certain police reports had been spoken of by a witness or witnesses during the trial?**

■ In his initial motion (but not repeated in the supplemental brief) Defendant argues that the court should have instructed the jury that there was testimony from Officer McCord regarding police reports in response to the jury's request to see copies of those reports. The reports were not in evidence, and the parties did not agree to enter them into evidence *nunc pro tunc.* The court denied the request to send the jury things not in evidence, and further denied Defendant's request to give them additional information in the form of a supplemental factual "instruction" that had not been sought. (Tr. Vol. 3, at 111.)

Defendant provides no basis for his argument that this decision "denied the defendant a fair trial." The challenge is unconvincing and is rejected.

**Ground 12. Was the decision of the court to refer the jury to certain testimony of defense witness Edwards during deliberations error?**

■ Also argued in his initial motion, but not in the supplemental brief, is Defen-

---

**14.** Contrast the "devastating" cautions given by this court to comments labeled as mere "sharp criticism," and reported in *United States v. Poindexter*, 942 F.2d 354 (6th Cir. 1991). The Sixth Circuit reversed in part because the criticism might have been heard by the jury:

At a bench conference following the ruling, defense counsel contended that it was indeed proper for him to argue that if the fingerprints had belonged to his client, the prosecution likely would have brought out that information. The court responded:

Don't you realize that that's an *unfair* statement? You know that there could be no

fingerprints on there, and it didn't prove that your client didn't handle them. I don't want you to get into that. *That's not fair. That's below the belt* for you defense lawyers to do it. You're not the only one that does it. *That's not a search for the truth. That's just trying to fudge on the rules. You ought to be reprimanded for it.* . . . Look, y' all are on notice that this Judge is not going to permit that. I've stopped other people from doing it. *It's an attack that,* I think, *goes to your ethics.*

*Id.* at 359 (emphasis added).

dant's argument that the court should not have permitted the jury to hear the answer to their question as to the existence of certain testimony by Clarence Edwards. Defendant's attorney argued at trial that either the court should not answer the request, saying only that "they should rely on their memories," or transcribe the entire trial ("everything") and send it in to the jury. (Tr.Vol. 3, at 119.)

The court declined both these options, and directed the court reporter to read back the only use of the word "possession" by Edwards that she could locate. Defendant asked that some additional context questions and answers be read both before and after the use of the word possession, and the court agreed with that.

After the testimony, the court cautioned the jury against "elevating this particular testimony above all other testimony," and that they should mainly "rely on your collective memory," much as Defendant had suggested. (Tr.Vol. 3, at 123.)

The court asked whether there was any further comment or objection, and there was none. (Tr.Vol. 3, at 124.) No basis is given for Defendant's argument that this response by the court deprived him of a fair trial. The challenge is rejected.

### Ground 14. Was there a prejudicially cumulative effect of errors?

Defendant argues lastly (and very briefly) that even if no single error requires a new trial, the total effect of the errors alleged does so require.

▆▆▆▆ The accumulation of non-reversible errors, however, must lead the court to the firm belief that an injustice has been done resulting in a "fundamentally unfair" proceeding. *See United States v. Parker*, 997 F.2d 219, 221 (6th Cir.1993) (finding that four errors taken in isolation were harmless, but when considered cumu-

latively necessitated reversal); *United States v. Ashworth*, 836 F.2d 260, 267 (6th Cir.1988) (errors not depriving a person of due process considered alone may cumulatively produce a trial that is "fundamentally unfair"). The mere addition of numerous insubstantial complaints, however, does not lead to a successful "cumulative error" argument. *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir.2000) (defendant cannot simply add individual meritless claims to show cumulative error).

There is no cumulative error made out by a combination of the various unavailing arguments raised in this case.

### IV. UNWARRANTED AND UNPROFESSIONAL LANGUAGE EMPLOYED IN DEFENDANT'S SUPPLEMENTAL BRIEF

The court will finally address the language employed in Defendant's supplemental brief in support of these motions. The court does not know if this brief was a collaborative effort or the work of only one attorney,[15] but all three attorneys of record for Defendant signed the brief on behalf of Defendant, and are therefore responsible for it.

In the brief, Defendant's attorneys have, among other things

1. Characterized a perceived difference in certain voir dire questions by the court as raising "an ugly inference," i.e. that the court intentionally and improperly excluded a venireman who would be expected to have "empathy for an accused person";

2. Stated that "the Court apparently cannot even spell correctly" (referring to the court's apparently misstated, on-the-record spelling of "gangsta" as "gansta" in questioning

---

**15.** The docket shows that a third attorney, Mr. Herbison, added his appearance to those

of Mr. Massey and Ms. McClusky after the verdict was rendered.

the jury about juror knowledge of that genre of rap music);[16]

3. Asserted that a government attorney's question during cross-examination, which was withdrawn upon defendant's objection, should be viewed as obviously deliberate misconduct since "no participant in this trial just fell off the turnip truck";

4. Asserted that the government's cross examination in this regard was a "bold stunt," and constituted a "highly improper tactic better left to television courtroom dramas";

5. Asserted that the re-trial in Jackson Tennessee was before a jury that was "oh, so incidentally whiter" than that available in Memphis;[17]

16. The court has no independent recollection or tape recording available. Accordingly, there is no way for the court to determine whether the transcript's spelling resulted from the court's slip of the tongue (which certainly can happen, even when the court did indeed intend to say "g-a-n-g-s-t-a"), or from a mistake by the court reporter (an event that hopefully is more rare but still imaginable). Defendant's attorneys for some reason seem to have become fascinated with this presumed mistake during briefing, as the brief repeats the phrase " 'gansta' [sic]" four or five times in the course of arguing the absence of relevance of that phrase for voir dire examination. Given the discourteous and unprofessional nature of the cited portions of the balance of the brief, and given the use of the phrase, "the Court apparently cannot even spell correctly" in relation to the word in question, it seems most likely that these attorneys seek to mock and ridicule the court with its apparent mistake.

If the court is guilty of spelling the term without a second "g", as the defense lawyers charge, the court is not alone in so doing. A search on WestLaw's Westnews database in late May, 2002 retrieved 44 documents in which "gansta rap" has appeared since January, 1999. "Gangsta" far outnumbers "gansta," revealing more than three thousand three hundred published usages in the same database during the same time period. The court does not know if "gansta" represents a misspelling committed by *The Toronto Globe & Mail* (05/07/02), *The Rocky Mountain News* (4/12/02), *The Boston Globe* (4/8/02), *The Washington Times* (10/3/01) and some forty others, or if "gansta" is thought to be a mere alternate spelling of "gangsta."

Whether it be "gangsta" or "gansta," the word is clearly a neologism that is significant mainly as a kind of slurred near-homonym verbalization of "gangster." It is not a word whose spelling is recognized in standard English.

17. Defendant's attorneys do not directly express a complaint, preferring to salt the record with the potentially explosive charge of racially-tinged improprieties in the retrial occurring at Jackson. By connecting the allegation of a "whiter" jury to the derisive phrase "oh, so incidentally," counsel are actually asserting the opposite of an "incidental" effect, i.e., an *intentional* effort by someone to procure a "whiter" jury than was had in Memphis.

Because the Defendant's assertion of impropriety passes by in a moment, connoted only by devious phrasing and unaccompanied by any explanation, it remains unclear whether the impropriety alleged is supposed to be attributed to this judge (whose case manager simply scheduled the retrial to occur at the only Western District of Tennessee courtroom available to a visiting judge at the time), or whether it is intended to constitute some kind of stage-whispered, belated challenge to the array used in the Eastern division.

This court does not make notes about a jury's racial composition unless the issue arises at trial, and the record reveals no contemporaneous *Batson* challenge nor any challenge to the array either at Memphis or Jackson. The court's recollection, however, is that the same number of African American jurors (two) actually served on both the Memphis and the Jackson juries.

Given the previously-noted manner in which the brief attempts to ridicule this judge regarding the possible misspelling of "gangsta," the court concludes that the entirely unsupported allusion to racial discrimination found in counsel's "oh, so incidentally whiter" statement is not-so-incidentally targeted at this judge personally. Such a charge is a matter of grave seriousness, especially when brought against a judicial officer individually. Defendant's attorneys, however, do not comport themselves with the level of seriousness so clearly implicated by such a charge. They take a low road, condemning by implication

6. Asserted that this judge

a. "effectively allowed [the government] to throw a skunk into the jury box";

b. allowed "the government to get away with" the parole issue, the court's treatment of which was "just plain wrong";

c. spoke to the jury during instructions in "code words";

d. "undermined the Defendant's theory";

e. instructed the jury in a way that was "subtle but pernicious";

f. launched a "devastating attack" on the defense attorney;

g. "singled out" the defense attorney for criticism;

h. perpetrated some unspecified "calumny" (i.e., slander or character assassination);

i. in instructing the jury, spoke with obviously false "sincerity" similar to the praise heaped upon Caesar by his murderer Brutus;

and without proof, leaving the reader to use his imagination to fill in the details of the supposed impropriety. Such tactics are, in this court's opinion, both intellectually lazy and odious.

18. Most prominent among the points that arrested the court's attention, and that warranted financial sanctions, were that the brief:
1. asserted that the opposition would not settle *"unless* [their] *pals at Busch got off scot-free"*;
2. characterized the opposing party as wishing to *genuflect* to a supplier, Busch;
3. asserted that opposing counsel *"engaged this court in an intentional misrepresentation of the facts"* and rhetorically asked whether opposing counsel thinks the attorney *"so stupid or this court so gullible"* that it can "get away with such tactics?";
4. characterized opposing counsel as using *"underhanded tactics"* and "continu[ing] to play cutesy with this court";

j. took "a gratuitous shot" at the Defendant's attorney.

Language such as that exhibited in Defendant's supplemental brief is inflammatory, unwarranted and unprofessional. It borders closely upon the dishonest and sanctionable.

Far milder, but still clearly unprofessional examples were set forth in *Kapco Mfg. Co., Inc. v. C & O Enterprises, Inc.,* No. 84 C 10129, 1986 WL 13753 (N.D.Ill. 1986). In *Kapco,* the district court sanctioned an attorney for filing briefs that were "replete with unnecessary invective." The court said that the briefing provided "vivid illustrations of the quality of lawyering in which [the attorney] engaged throughout the course of this litigation." [18]

The *Kapco* court said that "[t]he sort of invective of which [these] briefs are replete is not only unnecessary and distracting in the sense that it detracts the reader's attention from the argument: worse, it is discourteous, unprofessional, and unbefitting the role of an attorney as an officer of the court." *Id.* at 27. Further, the court found that "[b]ecause its use degrades and demeans the judicial system, it is deserving of severe censure." *Id.*[19]

5. characterized opposing counsel as presenting *"a bald face attempt to set up the opposition through what can only be interpretted* [sic] *as a dishonest letter"*;
6. characterized opposing counsel as presenting *"protestations of innocence* [that] *amount to nothing more than posturing and a sickening effort to befuddle this court"*;
7. characterized opposing counsel as presenting *"a cutesy argument."*
*Id.* at *26 (emphasis in original).

19. *See also Northern Assur. Co. of America v. Lark,* 845 F.Supp. 1301, 1305 n. 7 (S.D.Ind. 1993) ("The briefs ... are steeped with disparaging, inflammatory, and just plain snide comments.... Arguments laden with this kind of 'commentary' are distracting and become tiresome quickly."); *Metro Pub., Ltd. v. San Jose Mercury News,* No. C 91–20605 SW, 1995 WL 232363, *5 (N.D.Cal.1995) ("[T]he briefs on these motions contain the type of spite and vitriol that gives lawyers a bad

It is this court's observation that the attorneys who authored and signed the brief in support of the instant motion have employed invective considerably more abusive than that so heavily criticized in the cases cited above. Defendant's motion properly raised to the court's attention substantive issues that required resolution, but the manner of briefing has been, in the court's opinion, largely "discourteous, unprofessional, and unbefitting the role of an attorney as an officer of the court."

Vigorous representation of high quality is not associated with *ad hominem* insults addressed to the court and opposing counsel. Sprinkling one's writing with venomous language may momentarily entertain the lawyer or his client, but it does not effectively promote the client's real interests before the court.

It is this court's belief that attorneys should be proud of their profession, and proud to have the important responsibility of representing their clients. The court fails to comprehend any reason for the remarkably disagreeable tone of the supplemental brief, standing as it does in such sharp and unfavorable contrast to the high degree of courtesy to the court and general level of civility displayed by Defendant's trial counsel during all in-court proceedings.

Based on the foregoing, these three attorneys have good reason to be thoroughly embarrassed that they have authored and/or signed a brief, now permanently a part of the files of this court, containing allegations and assertions that "degrade and demean the judicial system," *Kapco,* 1986 WL 13753, "undermine the public's respect for the legal profession as a whole," *Harris,* 1993 WL 300052, and "give

name.... Conduct such as the parties exhibit here weakens their arguments in court, and undermines the public's respect for the legal profession as a whole."); *United States v. Harris,* No. S1 92 Cr. 455, 1993 WL 300052, 24 n.

lawyers a bad name." *Metro Pub., Ltd.,* 1995 WL 232363.

## V. CONCLUSION

No monetary or other sanction is imposed with respect to counsel's unprofessional language and allegations, as set forth above. The court simply records here that among those few lawyers whose professional reputations are significantly tarnished in the eyes of this court now stand Mr. William Massey and Ms. Lorna McClusky of Memphis, and Mr. John Herbison of Nashville.

Defendant's Motion for Judgment of Acquittal is **DENIED;** Defendant's Motion for a New Trial is **DENIED.**

11 (S.D.N.Y.1993) ("[W]hile vigorous advocacy is welcomed," briefs were "remarkable for their shrillness and vitriol," and "invective employed in parts of defendant's brief is more distracting than it is persuasive.").