**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Patrick HOUSTON, Defendant–
Appellant,**

No. 02–5831.

United States Court of Appeals,
Sixth Circuit.

Sept. 7, 2004.

Haynes, District Judge, filed dissenting opinion.

Tony R. Arvin, Asst. U.S. Attorney, Memphis, TN, for Plaintiff–Appellee.

John E. Herbison, Nashville, TN, for Defendant–Appellant.

Before DAUGHTREY and GILMAN, Circuit Judges, and HAYNES,* District Judge.

DAUGHTREY, Circuit Judge.

At the time of his arrest by Memphis police, defendant Patrick Houston was apparently a popular rap musician who had recorded best-selling CDs under the name "Project Pat." He was charged on two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and was subsequently convicted by a jury on both counts. He now appeals, contending that the district court committed numerous errors at trial that—collectively, if not individually—were sufficiently serious to require a retrial. These included (1) questioning prospective jurors during voir dire concerning their acquaintance with "gangsta rap," (2) permitting references to the defendant's parole status, (3) failing to declare a mistrial when the prosecutor cross-examined a defense witness about lyrics in a song recorded by Houston, and (4) making certain errors in the jury instructions. After a careful re-

---

* The Hon. William J. Haynes, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

view of the record on appeal and the trial record, we find no reversible error and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In a published opinion denying the defendant's motion for a judgment of acquittal or, in the alternative, a new trial, the district court summarized the evidence against the defendant as follows:

On the morning of January 19, 2001, Defendant Patrick Houston was driving his black Cadillac Escalade SUV and was stopped by an officer of the Memphis, Tennessee Police Department because he was exceeding the speed limit and because there had been a general police alert concerning "several Cadillac Escalades" recently reported as stolen from local dealerships. As the officer approached the driver's door, he saw through the rear seat's window what appeared to be the butt of a firearm protruding from the map or storage pocket situated on the back of the driver's seat.

Without alerting Houston to what he had seen, the officer asked Houston to step from the vehicle. After receiving Houston's identification and having some preliminary discussion at or near the police car, the officer asked for permission to search the vehicle, and Houston consented. The officer retrieved the firearm and brought it to the police car. Another officer came to the scene and in doing a more complete search found a second, smaller firearm hidden under the floor mat at the driver's feet. Both firearms were loaded. After being given Miranda warnings, and confronted with the evidence, Houston admitted that the guns were his and said that he "needed them" for personal protection since the business he was in, making rap

music, was "dangerous." He claimed to have bought one gun "off the street" and the other through a girlfriend. He expressed concern about his parents finding out, and worried aloud that this event would ruin the chances for success of his next recording, soon to be released, and violate his parole.

At trial, Houston chose not to testify, but produced the original purchasers of the firearms, both of whom were longtime friends of Defendant and occasional employees of Defendant's recording company. The witnesses said that Tobert Carruthers had been in possession of Houston's vehicle from the previous day because Houston did not want a certain woman to see Houston's vehicle at Houston's house, and thus learn that he was at home. The witnesses said that Clarence Edwards was picked up by Carruthers at his house and then they both proceeded to pick up Houston. They all then drove to a Memphis mall to visit a tuxedo rental store.

Both Edwards and Carruthers testified that they had lawfully purchased the firearms. Carruthers testified that he had carried his firearm to the vehicle the previous evening while preparing to drive his wife and young children to dinner and a movie, then hid the firearm under the floor mat and forgot it was there. He said that he did not tell either Houston or Edwards that the firearm was present.

Edwards testified that he brought his firearm out to the vehicle that morning, partially concealing it in a zippered calendar or "day-planner" case. He had it because he intended to go to a practice range later that day and use it; he said that this was first time in the years since he had purchased the gun that he had brought it out of his house. He said he did not tell Carruthers or Houston about the firearm being present.

*United States v. Houston,* 205 F.Supp.2d 856, 859–60 (W.D.Tenn.2002).

In addition to the evidence summarized by the district court, it is significant that in rebuttal, the government offered the testimony of Shaneka Moss, the manager of the tuxedo shop that Carruthers and Edwards said they had visited on January 19, 2001, the morning of defendant's arrest. Moss testified that the bride and groom did not register at the tuxedo shop until February 3, 2001, and that Carruthers was scheduled for a tuxedo fitting on February 5, 2001, not January 19.

The jury convicted Houston on both counts of the indictment, and the district court subsequently denied his motion for judgment of acquittal, commenting that "the Carruthers/Edwards story about their separate, simultaneous placement of two guns in one vehicle was ... a much-too-convenient coincidence, and transparently false." *Id.* at 862.

### DISCUSSION

**1. The Challenge to Voir Dire**

 Perhaps the most controversial aspects of the defendant's trial stemmed from his involvement as a rap musician. He complains, for example, that the district court questioned prospective jurors about their knowledge of and reaction to the existence of rap music and, specifically, "gangsta rap," a genre of rap music that concerns and apparently even extols street violence. The defendant contends, in particular, that references to "gangsta rap" were extraneous and therefore prejudicial to his right to an impartial jury. He also complains, as discussed below, that the district court allowed questioning about certain song lyrics concerning the use of guns and the commission of violent crimes.

Had the defendant been charged with a non-violent offense such as bank fraud, or tax evasion, these complaints might well provide grounds for relief on appeal. However, the charges against Houston involved the possession of firearms, and the arresting police officer testified that when he discovered the guns in the Escalade Houston was driving (and in which he was the only occupant), Houston stated that he needed "protection" because he was in the "dangerous business" of rap music. His defense at trial, that the guns were not his and that he was completely ignorant of their location in his vehicle, made the circumstances of his connection with "gangsta rap" relevant.

The district judge knew that concerns involving Houston's involvement in the rap music industry and his possible connection with "gangsta rap" might arise during voir dire, because the case had gone to trial two months earlier and had resulted in a mistrial when the jury was unable to agree on a verdict due, apparently, to juror misconduct. *See Houston,* 205 F.Supp.2d. at 869, n. 12. A reading of the transcript of jury selection at this second trial reveals that the judge was at great pains to make sure that the jurors would not be swayed one way or the other simply by the fact of the defendant's status in the world of popular music. For example, one prospective juror was the manager of a music store who, when asked if he had any knowledge of a group called "Three 6 Mafia" (the defendant's group) or "a particular performer called ... Project Pat," indicated that he did because he had to "demo" it to his customers. He also indicated that he "d[id]n't like that kind of music," causing the district judge to ask, "Is there is anything about that genre of music, that category of music or any of the topics that are contained within that [kind] of music that causes you to think in any way that you would be unable ... to fairly assess the evidence in this trial?" When the juror answered in the negative, the district

judge then asked, "All right. So you've never had any particularly difficult experiences or particularly favorable experiences in connection with this music of customers that are associated with that music?"

We think it is clear from this exchange that the district court's questioning during voir dire was directed at securing an impartial jury and that it did not inject extraneous or prejudicial issues into the selection process. Reviewing this issue for abuse of discretion, we simply find none.

## 2. References to the Defendant's Parole Status

■ The defendant next argues that the district court should have prohibited testimony concerning his parole status at trial because such references were both irrelevant and unfairly prejudicial and, therefore, inadmissible under Federal Rules of Evidence 401, 403, and 404(b). We also review this decision for abuse of discretion and, once again, find none.

The jury was aware that the defendant had a felony conviction because Houston was being prosecuted under 18 U.S.C. § 922(g)(1), which prohibits convicted felons from possessing firearms. As a result, the fact that the defendant had a prior criminal record was relevant under Rule 401. Moreover, Houston's statement to the police at the time of his arrest that being found in possession of a weapon would violate his parole status necessarily injected the issue into the trial. As the district court found, the statement had significant probative value because it "indicated immediate consciousness of guilt, *i.e.,* the statement showed that Defendant understood that he was prohibited from firearm possession." *Houston,* 205 F.Supp.2d at 867. Houston now argues that the relevance of his parole status is outweighed by its possible prejudice, based on his theory that the fact of parole would lead the jury

to believe that his prior conviction, even if relevant, was perhaps more serious than it actually was.

In this regard, Houston points to *Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), and argues that the reference to his parole status went beyond the stipulation introduced by agreement that he was a convicted felon. In *Old Chief,* the Supreme Court held that a district court must accept a defendant's offer to stipulate the existence of a prior offense in a felon-in-possession case, if the nature of the prior conviction raises the risk of improper considerations by the jury and if the only rationale for admitting evidence of the offense is to prove that the defendant meets the relevant criterion of 18 U.S.C. § 922(g)(1). *Id.* at 190–91. We conclude that the defendant's reliance on *Old Chief* is misplaced. The most that the fact of parole added to the stipulation in this case was that Houston's prior conviction was relatively recent. However, this fact alone would not be sufficient to outweigh the otherwise probative weight of the defendant's statement to police reflecting his consciousness of guilt.

## 3. Failure to Declare a Mistrial

■ The defendant contends that the district court should have declared a mistrial when the prosecutor, in cross-examining defense witness Tobert Carruthers, asked if Carruthers knew whether the defendant "like[d] guns" or had written songs about guns. When Carruthers, who had known the defendant for more than a dozen years, had worked part-time for the defendant's recording company, and had acted as his driver on tour, responded that he "didn't know" whether or not the defendant liked guns and that the song lyrics he was familiar with concerned women, not guns, the prosecutor asked about a particular Houston song, "Murderers and Rob-

bers." Arguably, this reference was, as counsel for the defendant now describes it, "beyond the pale." However, when counsel objected to the question at trial, the prosecutor promptly dropped this entire line of questioning.

In view of the prosecutor's immediate response and the strength of the evidence introduced at trial, we conclude that this isolated reference was not so egregious as to require the declaration of a mistrial, when measured by the standards set out in *United States v. Green*, 305 F.3d 422, 429–30 (6th Cir.2002). In reaching this conclusion, we note that the cautionary instruction given the jury was particularly well-developed:

> You heard at one point a few questions of a witness that dealt with what were supposed to have been certain rap music lyrics or CD titles. Keep in mind that questions by an attorney—the questions by an attorney do not form the evidence in the case and that anything that is said by an attorney that is not supported by evidence or by common sense must be disregarded. So if there is no actual evidence in the case regarding rap music lyrics or CD titles, then the substance of an attorney's questions on those points should be disregarded.
>
> Also, please—on this point of rap music, titles and so forth, please avoid using in your deliberations any possible preconceived notions of your own or of anyone else regarding rap music performers, musicians or others in that business. Rumors or possible suspicions about character and behavior are not proper evidence in a court case....

Taking the record as a whole, as we are required to do under *United States v. Francis*, 170 F.3d 546, 552 (6th Cir.1999) ("The determination of whether a prosecutor's behavior constituted prejudicial error must be made in the context of the whole

trial."), we decline to find reversible error in connection with the district court's ruling on the request for a mistrial. Indeed, we agree with the district court's assessment that "there was no unfair prejudice that substantially outweighed the proper and probative purpose of the government being allowed to try to challenge the credibility of an important defense witness's direct testimony that the defendant had no knowledge of the two guns in the vehicle." *Houston*, 205 F.Supp.2d at 867.

**4. The Jury Instructions**

The defendant challenges three portions of the district court's instructions to the jury, two of which produced no objection at trial and are therefore reviewed only for plain error. *See United States v. King*, 169 F.3d 1035, 1040 (6th Cir.1999). The first of these came during the court's discussion on the weighing of witness credibility, when the district judge used a hypothetical example concerning a traffic accident and told the jurors that in asking themselves whether a witness had "something to gain or lose from testifying," they could consider the witness's relationship to the parties, *i.e.*, whether the witness to a traffic accident was "the driver's nephew or other close relative or childhood friend." The defendant now contends that the mention of a "childhood friend" was an unduly prejudicial reference to Tobert Carruthers, the defense witness who testified that he had known Houston for 13 years. We simply fail to see how this instruction constituted plain error.

We likewise fail no find plain error in connection with the district court's statement that the defendant's theory of the case was neither "the Court's position" nor "the position of the law," but was "merely the statement of the defense." This instruction followed the judge's read-

ing of the defense theory and explained what that statement constituted.

■ Finally, the defendant objects to statements that the district judge made to the jury concerning comments by both the prosecutor and the defense attorney regarding legal standards for the search of a vehicle. Defense counsel complained at the time that he had been singled out and disparaged when the district court referred to him by name. In response, the district court told the jurors that they need not consider the issue of whether the search of the defendant's car was legally proper and that the instruction "appl[ied] to all the lawyers." There is no evidence in the record that the judge's remarks reflected a bias against the defendant, nor was there any indication that his evenhanded and relatively mild statements to the jury were meant to be personal to the defendant's lawyer or that they were unfairly critical of him in either tone or content.

## CONCLUSION

For the reasons set out above, we find that none of the alleged errors cited by the defendant warrants reversal of his conviction. In addition, recognizing that "[e]rrors that might not be so prejudicial as to amount to a deprivation for due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair," *United States v. Pierce*, 62 F.3d 818, 834–35 (6th Cir.1995), we have also weighed the alleged errors cumulatively and, nevertheless, find no basis on which to overturn the defendant's conviction. We therefore AFFIRM the judgment of the district court in all respects.

HAYNES, District Judge, Dissenting.

I respectfully dissent. Of the issues presented, four errors,[1] when considered cumulatively, rendered the Defendant's trial fundamentally unfair. These errors, in essence, are: (1) the district court's judicial notice of "gangsta rap" and its failure to conduct a complete *voir dire* of all prospective jurors regarding any opinions or prejudices against "gangsta rap"; (2) the government counsel's reference to the title of the Defendant's song "Murderers and Robbers" during the cross-examination of a defense witness in violation of his pretrial agreement on this subject; (3) the district court's singling out the credibility of a key defense witness in a jury instruction highlighting the "childhood friend" relationship; and (4) the repeated references to the defendant's parole status without a limiting or curative instruction to the jury, as required by this Court's precedents.

### 1. *Judicial Notice of "Gangsta Rap" and Inadequate* Voir Dire.

As to context, the first trial in Memphis resulted in a hung jury and upon the district court's motion, the second trial was held in Jackson, Tennessee. During *voir dire* at the second trial, the government counsel asked prospective jurors if any knew of the Defendant's stage name or the name of his performing group and made a reference to the Defendant's music as "gangsta rap." (JA 43–44). After overruling the Defendant's objections to these inquiries, the district judge then characterized the Defendant's music as "gangsta rap" and took judicial notice that "gangsta rap" was a type of rap music. (JA 42–43). The Defendant's counsel expressed his opinion that he did not know whether his

---

1. There are other issues presented, but given my conclusion on four of the errors, consider- ation of the remaining errors is unnecessary.

client's music was "gangsta rap." The colloquy on these subjects was as follows:

MR. MASSEY: ... The question regarding gangsta [sic] rap—

THE COURT: Yes.

MR. MASSEY:—I would ask the court to delete the "gangsta" [sic] portion.

THE COURT: Why?

MR. MASSEY: Because it's not probative of anything.

THE COURT: Questions are not probative. Questions in themselves are not probative. The question is whether the information might prove helpful to selecting a fair and impartial juror—jury.

MR. MASSEY: Yes, sir. *I think what it does is it taints the jury right off the bat when we start talking about gangsters and guns.* They equate one with the other.

THE COURT: Let me ask you this. Is the genre not known within itself as gangsta [sic] rap?

MR. MASSEY: It's known also as rap also, Your Honor.

THE COURT: Is it not known as gangsta [sic] rap?

MR. MASSEY: There's different kinds of rap, is my understanding, and gangsta [sic] rap is one of the different kinds of rap. And I don't think that Mr. Arvin or anyone else here knows whether or not the rap that Mr. Houston does is gangsta [sic] rap.

THE COURT: Haven't I reviewed lyrics written, allegedly, by Mr. Houston referring to guns and drug dealing and such as that?

MR. MASSEY: Yes, Your Honor.

THE COURT: Yes. I'm going to include, as Mr. Arvin suggests, the phrase "gangsta [sic] rap" as being particularly descriptive of the genre of

music that Mr. Houston produces and performs.

MR. MASSEY: One of the concerns I have about this, Your Honor, is it's going to give more [or] less a carte blanche to the government to challenge African–American jurors.

THE COURT: I don't see the connection.

MR. MASSEY: Because it's going to be African–American jurors that's going to have heard of gangsta [sic] rap and not the white jurors.

THE COURT: I've heard of it. You've heard of it. Neither one of us—

MR. MASSEY: I'm not familiar with it, and I think Your Honor probably isn't anymore familiar than I am other than looking through those lyrics.

THE COURT: Oh, you may be surprised, Mr. Massey.

But in any event, it's not something that gives carte blanche to anybody to do anything. It's merely inquisitive, and it may lead to additional information provided by individual jurors.

The question, obviously, to me, seeks to provide the attorneys information as to whether any particular juror has a particular fan-like affinity for Mr. Houston personally. That's the point of these questions, and that is where this would go. It doesn't give carte blanche to the government or to the defense or anybody else for excusing jurors. It's a matter of inquiry, and it's going to be taken as such.

Do you have anything else?

MR. MASSEY: I agree with that, Your Honor. I do agree with that, and I don't mean to be argumentative with the court, but I would say that the last two questions that Mr. Arvin set out asking if the jurors are familiar with Project Pat or if they're familiar with

a group called Three 6 Mafia adequately address that inquiry that the court seems to believe is bona fide, which I agree with. But gangsta [sic] rap, I just wanted to—

THE COURT: Okay. Well, you know, it's not the government that developed the name of the genre. *The court takes judicial notice that there is a musical genre that is self-identified as gangsta, [sic,] spelled g-a-n-s-t-a, rap.* And it's just—I'm going to inquire about it. I mean, I don't know whether the jurors are going to say yes or no. The last time I don't think any of them admitted any knowledge of it. But it's a matter that's at rest as far as I'm concerned.

(JA 41–43) (emphasis added).

The District Judge then posed the following series of questions to the entire venire on the issue of "gangsta rap":

[The Court] *Do any of you have any particular interest in or connection with, in the music industry, what is known as rap music, especially what is known as gangsta [sic] rap music? Do any of you have connection with, affiliation with, any business interest or just a generalized interest in rap music, particularly what is called gangsta [sic] rap music? Any hand raised that? Are there others?"*

And particularly the gentleman who did raise his hand, do you have any—and others as well. Do any of you have any familiarity with or connection with a group that is called Three 6 Mafia or a particular performer call Project—or group, perhaps, called Project Pat? Any connection with or affiliation or knowledge of that?

You do, sir?

JUROR: Yes.

(JA 43–44) (emphasis added). The district court's follow-up questioning of the sole responding juror is noted below and revealed only this juror's business interest with this music.[2]

2. Only one juror responded to these questions and the subsequent colloquy with that juror was as follows:

THE COURT: Please restate your name. I do not remember your name

JUROR: I'm Daniel Bush.

THE COURT: Mr. Bush, you're a truck driver, I believe, aren't you?

JUROR: No, sir. I'm a store manager for a car stereo shop.

THE COURT: Oh. Well, there you go. So you're in the music business.

JUROR: Yes, sir.

THE COURT: So you sell music, too, or—

JUROR: No, sir. I just—I hook up stereos and demo a lot to customers, and I use those CDs in demo to my customers.

THE COURT: Okay, And is this something that—is your interest anything that goes beyond the business angle, or do you have—have you developed an individual interest in that particular variety of music as compared to any other variety of music?

JUROR: I don't like that kind of music, sir. I just have to demo it to my customers who like that kind of stuff.

THE COURT: Okay. So you've become acquainted with it, and you know these names among what? Among three other names or among a hundred other names of groups, musicians and artists or—

JUROR: Several. Just hearing my customers talk about them all the time and seeing their CDs in the cars. I just hear it a whole lot.

THE COURT: You've simply become acquainted with that.

JUROR: Yes, sir.

THE COURT: Is there anything about any of that genre of music, that category of music or any of the topics that are contained within that topic of music that causes you to think in any way that you would be unable to—

JUROR: No, sir.

THE COURT:—fairly assess the evidence in this case?

JUROR: No, sir.

THE COURT: All right. So you've never had any particularly difficult experiences or particularly favorable experiences in con-

Under Federal Rules of Evidence 201(a) and (b), judicial notice is limited to "adjudicative facts" that cannot be "subject to reasonable disputes" and must be "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." FED.R.EVID. 201(b). To take judicial notice, the district court must give a requesting party the opportunity to be heard on the subject of such notice. *Rose v. Hartford Underwriters Ins., Co.*, 203 F.3d 417, 421 (6th Cir.2000) (citing FED. R.EVID. 201(e)). Here, the district judge took judicial notice of "gangsta rap" without an opportunity for defense counsel to be heard on this issue. This approach seems inappropriate given defense counsel's express reservations about whether his client's music qualified as "gangsta rap." In addition, as reflected below, the lack of any significant juror response about knowledge of and/or connections with "gangsta rap" suggests that the phrase is not well known in that community.

For a court to take judicial notice of a fact, that fact must be relevant to the ultimate issue that the jury must decide. *See Bronson v. Bd. of Educ. of the City Sch. Dist. of the City of Cincinnati*, 687 F.2d 836, 839 (6th Cir.1982) (noting the district court's judicial notice of facts is limited to those facts relevant to the ultimate issue to be decided); and *Vallot v. Cent. Gulf Lines Inc.*, 641 F.2d 347, 351 (5th Cir.1981). As applied here, the majority relies heavily upon the police officer's trial testimony to establish the relevance of the term "gangsta rap." According to the officer's testimony,

nection with this music or customers that are associated with that music?
JUROR: No, sir.
THE COURT: It's just business to you, apparently.

however, the Defendant told him that "he needed them [the guns] for personal protection because he was a rapper by trade and that the rap business was a dangerous business." (JA 259). The statement was only that the Defendant was a "rapper" in the "rap business." (JA 359). In a word, the testimony does not reflect that "gangsta rap" was relevant to the trial.

Moreover, the credibility of the police officer's testimony was a critical point at trial. Michael McCord, the arresting city police officer and the government's key witness, testified about the defendant's admission of possessing the weapons. Yet, McCord conceded that neither his incident report nor his affidavit for the arrest warrant mentioned the defendant's statement about ownership of the guns. McCord did not have any document on which he recorded the defendant's statements about gun ownership. Thus, based upon the proof "gangsta rap" was irrelevant to the issue the jury had to decide and was an improper topic for judicial notice under the facts of this case.

In a criminal action, the district court must also inform the jury that a court's judicial notice of a fact is not binding on the jury. FED.R.EVID. 201(g). In *United States v. Mentz*, 840 F.2d 315 (6th Cir. 1988), we stated:

> Even assuming the district court in this case judicially noticed the insurance overage by the FDIC, it was obligated to inform the jury that it could disregard the facts noticed. The court's failure to make such a statement permitted the jury to convict [the defendant] with-

JUROR: Absolutely.
THE COURT: Okay. Thank you, sir.

out ever examining the evidence concerning an element of the crime charged, and thus violated his Sixth Amendment right to a [fair] jury trial. *Id.* at 323. Here, the district court took judicial notice that "gangsta rap" was a type of rap music without further instructing the jury that the court's judicial notice was not binding and could be disregarded.

Yet, another critical error is the district court's failure to define "gangsta rap" for the jury venire. In *Tucker v. Fischbein,* 237 F.3d 275 (3rd Cir.2001), the Third Circuit adopted the definition of "gangsta rap" in the Encyclopedia Britannica:

> "Gangsta rap" has been described as a form of "hip hop" music that became the genre's dominant style in the 1990s, a reflection and product of the often violent lifestyle of American inner cities afflicted with poverty and the dangers of drug use and drug dealing. The romanticization of the outlaw at the centre of much of gangsta rap appealed to rebellious suburbanites as well as to those who had firsthand experience of the harsh realities of the ghetto.

*Id.* at 279, n. 1. *Tucker* further notes that "[p]rominent gangsta rap groups are described as 'present[ing] tales of gangs and violence,' 'offer[ing] hardhitting depictions of crack-cocaine related crime,' and featuring 'a marriage of languid beats and murderous gang mentality.' " *Id.* In my view, after the district court took judicial notice of "gangsta rap," it was incumbent upon the district judge to explore fully at *voir dire* any potential prejudice to ensure the impartiality of the jury. The district judge did not inquire of the any of the remaining jurors, if any juror had any preconceived or prejudicial opinions or resentment of rap music or gangsta rap. As reflected by the sole juror's response, the district judge's questions to the jury panel sought the jurors' "interest in or connection with"

including "any affiliation with any business interest or generalized interest" in gangsta rap or rap. (JA 43). The district court's injection of the concept of "gangsta rap" without further definition was unjustified by the proof.

In his jury instructions at the end of trial, the district judge told the jury "Also—please—on this point of rap music lyrics, titles and so forth *please avoid* using in your deliberations any possible preconceived notions of your own or any one else regarding rap music performers, musicians or others in that business." (JA 338–39) (emphasis added). This instruction underscores the importance of a complete *voir dire* on this subject of preconceived prejudices about "gangsta rap" music and demonstrates the inadequacy of the district judge's *voir dire*. In addition, the instruction should have told the jurors that they cannot consider such matters in their deliberations, not simply to avoid them.

It is important to note that the potential prejudice resulting from the use of the term "gangsta rap" during *voir dire* should not be underestimated because *"[v]oir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire the trial judge's responsibility* to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (emphasis added). There is an independent due process right to an impartial jury. *Morgan v. Illinois,* 504 U.S. 719, 726–27, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) ("[W]e recognized ... that the Fourteenth Amendment's Due Process Clause itself independently required the impartiality of

any juror empaneled to try a cause.... In short, ... due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment.") (citations omitted).

"The primary purpose of the *voir dire* of jurors is to make possible the empaneling of an impartial jury through questions that present the intelligent exercise of challenge by counsel." *Miller v. Francis,* 269 F.3d 609, 615 (6th Cir.2001) (quoting *United States v. Blount,* 479 F.2d 650, 651 (6th Cir.1973)). Although "[c]ounsel's action during *voir dire* are presumed to be matters of trial strategy," *Miller,* 269 F.3d at 615, *Rosales–Lopez* also imposes an obligation upon the trial judge to ensure an impartial jury, particularly when the judge conducts the *voir dire. Rosales–Lopez,* 451 U.S. at 187–88. As we stated in *Hughes v. United States,* 258 F.3d 453, 459, 463 (6th Cir.2001), "[t]he impaneling of a biased juror warrants a new trial ... [and a] court must excuse a prospective juror if the actual bias is discovered during *voir dire.*"

The Seventh Circuit noted "gangs suffer from 'poor public relations.'" *United States v. Irvin,* 87 F.3d 860, 864 (7th Cir. 1996) (quoting *United States v. Lewis,* 910 F.2d 1367, 1372 (7th Cir.1990)). In *United States v. Hendrix,* 52 F.3d 326, 1995 WL 218472 (6th Cir. Apr. 12, 1995), this Court found the unjustified introduction of evidence tying a defendant to a gang to be reversible error.

A police officer did, however, testify that in the photo, one of the subjects is making a signal to indicate membership in a gang.

\* \* \* \* \* \*

Even if Hendrix was a gang member or knew gang members, there is no evi-dence that any gang was in any way involved in the crime for which he was tried and convicted. There is simply no connection between this photograph and the crime, and the photo is thus irrelevant to the trial. At the same time, the photo seems intended to appeal to jurors' prejudices about the young black men, rather than to their disinterested judgment of Hendrix's guilt or innocence of the charged crime.

*Id.* at \*1, 2. In *United States v. Wheeler,* 67 Fed.Appx. 296, 300 (6th Cir.2003), this Court considered the admission of evidence of gangs to be error, albeit harmless error, because "the introduction of evidence of [the defendant's] gang involvement appears to have no probative value as to the charge of conspiracy to distribute marijuana."

There are other decisions finding evidentiary references to gangs that are not material to the charge, to be reversible error, as cited in *Blackmon v. Booker,* 312 F.Supp.2d 874, 885–86, 890 (6th Cir.2004) ("The prosecutor had no right to suggest that the shooting was gang related when no evidence was presented to support that claim."). In *Washington v. Hofbauer,* 228 F.3d 689, 699–700 (6th Cir.2000), we granted federal habeas relief for a state prosecutor's references to "the evidence of [Petitioner's] character and lifestyle."

The injection of "gangsta rap", coupled with a lack of complete questioning during *voir dire,* was prejudicial error. First, based upon the arresting police officer's testimony there was not a factual basis to introduce the concept of "gangsta rap," that carries prejudicial connotations as noted by this Court, the Third and Seventh Circuits. Second, the district judge did not define "gangsta rap" to ensure that jurors understood its meaning so that they could appropriately respond to the *voir*

*dire* questions. Third, the judge's *voir dire* also did not question whether the mere fact of the Defendant's association with rap or "gangsta rap" would cause a prospective juror to believe that the Defendant therefore knowingly possessed a weapon, as alleged by the government.

Given the above-cited decisions finding prejudice from unjustified references to gangs, the district court's reference to and its association of "gangsta rap" with the Defendant, coupled with an incomplete *voir dire* on this subject, I conclude that these circumstances create a serious likelihood of prejudice to the Defendant. Although there is no evidence of actual prejudice in the record, given this Court's precedents and its historical findings of prejudice in jury trials with unjustified references to gang association, I find the unwarranted introduction of "gangsta rap" during *voir dire* and the district judge's inadequate *voir dire* on this subject sufficient to warrant a new trial. As we stated in *Hughes*, "the presence of a biased juror like the presence of a biased judge is a structural defect in the construction in the trial mechanism that defies harmless error analysis." *Hughes*, 258 F.3d at 463; *Johnson v. Armontrout*, 961 F.2d 748, 756 (8th Cir.1992) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). Under the facts of this case, the prospect of likely prejudice from this unwarranted association of the Defendant with "gangsta rap" poses a "structural defect" and resulted in an unfair trial.

### 2. *Prosecutor's Reference to the Defendant's Music.*

A related error involves the government counsel's pretrial assurance, in response to the Defendant's motion *in limine*, not to refer to the Defendant's music without prior notice to the district judge and defense counsel. The government's counsel told the Court and defense counsel that:

> The defendant in this case is a well-known and successful "gangsta" rap musician. He released a best-selling CD in 2001. Virtually every song on this CD contains references to firearms, with the vast majority of the songs in fact promoting and glorifying the carrying and use of firearms. If the defendant testifies at trial and denies knowledge of the guns in his car or denies having anything to do with guns, the United States proposes to use the CD to rebut defendant's claims. The material on the CD shows the defendant's affinity for firearms and is relevant to his motivation for possessing firearms in this case.

> *The United States, however, will not pursue this line of questioning before the jury without first obtaining the ruling of the Court. The United States requests the Court further to defer any ruling on this matter until 1) it has heard the defendant's testimony and 2) it has reviewed the materials the United States may use in its questioning.*

(JA 17–18) (emphasis added).

Later at trial, without notice, the government counsel questioned a defense witness about a title of a song on the Defendant's compact disc, "Murderers and Robbers." (JA 48). The Defendant's counsel objected to that question and the prosecutor withdrew his question and abandoned that line of questioning. The district court did not give any curative instruction, but denied the Defendant's motion for a mistrial for this question. At oral argument, the government counsel conceded that at the first trial, that resulted in a mistrial, the government did not refer to the Defendant's music.

In this Circuit, we require government counsel "to adhere to [an] agreement" made prior to trial on disclosure of evi-

dence. *United States v. Atisha*, 804 F.2d 920, 924 (6th Cir.1986). (citations omitted). In such instances, defense counsel "is justified in relying upon the government's representation." *Id.* A violation of the agreement involving the "withholding [of] important evidence or a key theory can obviously cause great prejudice to a defendant." *Id. accord United States v. Cole*, 857 F.2d 971, 976 (4th Cir.1988) ("It is paramount that when the government enters into a pretrial discovery agreement with a criminal defendant that it abide fully and completely by that agreement.") (citing *United States v. Millet*, 559 F.2d 253, 256 (5th Cir.1977)).

Here, the prosecutor agreed not to raise matters concerning the Defendant's music without prior notice to defense counsel and the court. When the prosecutor's question referred to the Defendant's song entitled "Murderers and Robbers," without notice, the prosecutor breached that agreement. Where the Defendant's knowing possession of the weapons is the critical issue at trial, to inject the subject of "Murderers and Robbers" and tie that title to the defendant, is prejudicial even if the question were withdrawn, particularly without any curative instruction from the district judge. The prosecutor's admission that the government did not raise this subject at the first trial, suggests that the titles of the defendant's music were neither material nor relevant to the government's case.

As to the substantive evidence sought by this question, a juror cannot judge the defendant on the basis of his vocation or the lyrics or titles of his music. Expressions of violence, without more, are protected by the First Amendment. *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430, (1969) ("[T]he mere abstract teaching ... of the moral propriety or even moral necessity for a resort to force and violence is not the same

as preparing a group for violent action and steeling it to such action.") (quoting *Noto v. United States*, 367 U.S. 290, 297–98, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961)). Lyrics cannot be considered as evidence of the artist's personal disposition. *McCollum v. CBS Inc.*, 202 Cal.App.3d 989, 249 Cal. Rptr. 187, 194 (1988) ("Reasonable persons understand musical lyrics and poetic communications as the figurative expressions which they are. No rational person would mistake musical lyrics and poetry for literal commands or directives for immediate action."). Where the defendant has "never put forth his writing as an example of his nonviolent character ... his writings are probative only if we accept the proposition that an author's character can be determined by the type of book that he writes." *State v. Hanson*, 46 Wash.App. 656, 731 P.2d 1140, 1145 (1987). I cannot discern a proper basis for this highly prejudicial question, particularly given the fact that the only issue before the jury was the Defendant's gun charge.

### 3. *Presiding Judge's Comment That Singled Out the Credibility of a Defense Witness.*

Another troubling issue is the district court's comment to the jury that, in effect, singled out a defense witness. At the first trial, the Court instructed the jury to consider any witness's relationship to any party in deciding credibility issues, i.e., "if the witness had any relationship to either side of the case." (JA 298a). During preliminary instruction at the second trial, the district judge instructed the jury on credibility of witnesses with the following example:

Or is that witness in some way related, for example, to driver number 1? Is this the driver's nephew or other close relative or childhood friend? Is there some relationship or something—does this witness have something to gain or to

lose from testifying that might motivate him to have a—shall *we say, a particular memory,* if that's what *we* want to call it, or perhaps even to motivate that witness to make up a story in support of driver number 1?

(JA 314b) (emphasis added). As a factual matter, based upon the evidence presented, this instruction could refer only to the defendant's witness.

To be sure, in charging the jury, the trial judge is not limited to instructions on abstract principles. *Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). To assist the jury in appropriate circumstance, the district court can explain and comment upon the evidence, as well as draw the jurors' attention to important evidence; and may express opinion upon the facts, "provided [the judge] makes it clear to the jury that all matters of fact are submitted to their determination." *Id.* Yet, the Supreme Court warned that "[t]he influence of the judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.'" *Id.* at 470 (quoting *Starr v. United States,* 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841 (1894)). In a jury trial, credibility judgments are the exclusive province of the jury. *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

To determine whether a trial judge's comment exceeded appropriate limits we consider if the proceeding is a "lengthy, complex trial", "if the attorneys . . . are unprepared or obstreperous," or "[i]f the facts are becoming muddled" and neither side is successful in clearing them up, and the conduct of the witnesses *United States v. Hickman,* 592 F.2d 931, 933 (6th Cir. 1979). This proceeding was neither lengthy nor complex. There were five wit-

nesses at a trial lasting one and one-half days. There was a single issue for the jury to decide. At the time of this preliminary instruction, there was not any attorney misconduct nor had matters become muddled as the proof had not commenced. Under the facts of this case, the district court's instructions and admonitions that could only apply to defense witnesses, were unwarranted.

Here, the critical issue at trial was the Defendant's knowing possession of a firearm and such unjustified references to witness credibility was unfairly prejudicial. The district judge's comment, that can be applied to one of the defense witnesses and their "particular memory," gives the appearance of warning the jurors about these witnesses. Under *Reeves,* a witness's credibility is the exclusive province of the jury. *Reeves,* 530 U.S. at 150. Moreover, "when an instruction prevents the jury from considering a material issue, it is the equivalent to a directed verdict on that issue and therefore cannot be considered harmless." *United States v. Jones,* 108 F.3d 668, 674 (6th Cir.1997) (quoting *United States v. Mentz,* 840 F.2d 315, 324 (6th Cir.1988)). Given the limited number of witnesses and the critical issue of credibility, the presiding judge's comment regarding witness credibility was inappropriate and prejudicial given the evidence to be presented.

4. *References to the Defendant's Parole Status Without a Curative Instruction.*

The fourth error concerns the evidence of the Defendant's parole status. The district court admitted testimony of the Defendant's parole status as probative of the Defendant's knowledge. From this record, the district court did not instruct the jury on his ruling or its consideration of this testimony. There were at least five

evidentiary references to the Defendant's parole status by witnesses and two references in the government's counsel's rebuttal argument. Six of the seven references were about testimony at the defendant's parole hearing.

As we observed in *United States v. Walker*, 160 F.3d 1078 (6th Cir.1998),

> [a]lthough the prosecution has a general right to "tell [its] story" and within limits, introduce the type of evidence it sees fit, that right has "virtually no application when the point at issue is a defendant's legal status, dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against him."

*Id.* at 1085–86 (quoting *Old Chief v. United States*, 519 U.S. 172, 190, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)). In the Sixth Circuit, "when evidence that the defendant was on probation when he allegedly committed the offense is presented to the jury and no curative instruction is given, 'prejudicial error has intervened'" *United States v. Balderas*, 27 F.3d 567, 1994 WL 144449, at *2 (6th Cir. Apr. 21, 1994) (quoting *United States v. Poston*, 430 F.2d 706, 709 (6th Cir.1970)).

In *Poston*, "[we] ... h[e]ld only that when during a jury trial evidence of the fact that at the time of the alleged offense for which the defendant is on trial he was on probation, and no corrective or cautionary instruction concerning that evidence is given to the jury, prejudicial error has intervened." *Poston*, 430 F.3d at 709. Yet, *Poston* is not a *per se* rule of prejudice. *Balderas*, 1994 WL 144449, at *3. Nevertheless, these repeated evidentiary references to the Defendant's parole status without any curative or limiting instruc-

tion, as required by *Poston*, undermines the Defendant's fundamental right to a fair trial.

In his post-trial ruling on this parole status issue, the district court opined that the average person would assume a person convicted of a crime would be on parole and the admission was harmless error. *United States v. Houston*, 205 F.Supp.2d 856, 868–69 (W.D.Tenn.2002).[3] The district court's opinion did not reflect any consideration of the *Poston* rule. Moreover, the fact that the first trial resulted in a mistrial tends to undermine the district court's characterization that there was "overwhelming evidence" of guilt to render this issue harmless error. *Houston*, 205 F.Supp.2d at 869. In my opinion, the admission of evidence of the defendant's parole without the curative instruction was plain error that prejudiced the Defendant.

### Conclusion

For these reasons, I conclude that the judgment was substantially affected by serious errors, that prejudiced the Defendant's substantial right to a fair trial, and that these error were not harmless. This conclusion is ground for reversal. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In sum, three of the four errors relate to the Defendant's music and his parole status. The effect of these errors leaves me with the firm belief that the Defendant's music and parole status played an influential and impermissible role in the Defendant's conviction. In addition, the credibility of the witnesses was crucial to the outcome of the trial, and the presiding judge's inappropriate "childhood friend"

---

**3.** In *Old Chief*, the Supreme Court noted that: "It is true that a prior offense may be so far removed in time or nature from the current gun charge ... that its potential to prejudice

the defendant unfair will be minimal." 514 U.S. at 185, n. 8. This suggests that a defendant may not be on parole at the time of this type of offense.

comment prejudiced the Defendant and his right to a fundamental fair trial. For these collective reasons, I respectfully dissent and would reverse and remand for a new trial.